SERLIN WINE AND SPIRIT MERCHANTS, INC. (Derby), Michael Kisner, Permittee; Serlin Wine and Spirit Merchants, Inc. (State Street, Bridgeport), Miguel Torres, Permittee; Wine Merchants Ltd. (Orange), Peter Kish, Permittee; Wine Merchants Ltd. (Broad Street, Bridgeport), Alan Rapkin, Permittee; Serlin Corporation (Fairfield), Kenneth Anton, Permittee; Serlin Corporation (Guilford), Charles Weber, Permittee; A & P Package Store, David O'Brien, Sr., Permittee; Mountain Top Liquors, Inc., Clifford Atkin, Permittee; Old Mystic Wine Cellar, Charles P. Hamm, Permittee; Plaintiffs,

v.

John F. HEALY, Louis A. Sidoli, David L. Snyder, Charles Kasmer, in their capacity as members or employees of the State of Connecticut and the Division of Liquor Control, Department of Business Regulation, Defendants.

John T. MORGAN, Stuart J. Filler, Charles A. Heckman, and David S. King, Plaintiffs,

v.

DIVISION OF LIQUOR CONTROL, DEPARTMENT OF BUSINESS REGULATION, STATE OF CONNECTICUT, Defendants.

Civ. Nos. B-80-297, B-80-280.

United States District Court, D. Connecticut.

April 15, 1981.

Alan Neigher, Leslie Byelas, Byelas & Neigher, Westport, Conn., Steven G. Mednick, New Haven, Conn., for plaintiffs.

Carl R. Ajello, Atty. Gen., Richard M. Sheridan, Robert F. Vacchelli, Robert M. Langer, John R. Lacey, Asst. Attys. Gen., Hartford, Conn., for defendants.

James A. Trowbridge, Bridgeport, Conn., for John Morgan.

Ralph J. Savarese, Ray A. Jacobsen, Jr., John C. Peirce, Howrey & Simon, Washington, D. C., J. Daniel Sagarin, Harrigan, Hurwitz, Sagarin & Rutkin, P. C., Milford, Conn., for amicus curiae Distilled Spirits Council of the United States, Inc., John McCarren, Washington, D. C., of counsel.

James M. Mannion, Bethel, Conn., for Conn. Beer Wholesalers.

Daniel E. Brennan, Sr., James J. A. Daly, Bridgeport, Conn., for Wine & Spirits Wholesalers of Conn., Inc.

Richard Goodman, Trowbridge, Goodman & Rosenthal, Hartford, Conn., for Conn. Pkg. Store.

DALY, District Judge.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

In these consolidated cases[1] plaintiffs seek to have Connecticut's Liquor Control Act, Conn.Gen.Stat.Ann. § 30–1 *et seq., as amended,* declared unconstitutional, claiming it to be in violation of the Sherman Act, 15 U.S.C. § 1 *et seq.*[2] Specifically, plaintiffs claim that Connecticut's statutorily mandated pricing scheme constitutes illegal price-fixing and resale price maintenance in violation of section 1.

Connecticut has what may be characterized as a tripartite pricing mechanism establishing the method by which liquor prices

---

1. Pursuant to Rule 42(a), Fed.R.Civ.P., this Court consolidated the two actions by order dated July 31, 1980.

2. 15 U.S.C. § 1 states in relevant part:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

are set by the manufacturer, or out of state shipper, the wholesaler and the retailer. The manufacturer, or out of state shipper, files with the Division of Liquor Control the list of prices at which it will sell its products to Connecticut wholesalers during the next month.[3] In the sale of spirits and cordials, the prices listed must conform to the requirement of Connecticut's Affirmation Statute[4] and all sales of alcoholic liquors must conform to the statutory prohibition against below cost selling.[5] Subject to these statutory provisions this is the method by which liquor is initially placed into the Connecticut marketplace.

The second tier of the pricing system involves the wholesaler who files with the Division a list of prices at which it will sell its product to retailers during the following month.[6] The wholesaler's price to the retailer cannot be lower than the wholesaler's "cost" as that term is statutorily defined.[7] On spirits and cordials, "cost" must include a minimum mark-up of 11% on the total of all other statutorily enumerated items of "cost." On beer, "cost" must include a minimum mark-up of 20% "of the sales price to the retailer." On wine bottled in the State of Connecticut, "cost" must include a minimum mark-up of not less than 36%. On wine not bottled in Connecticut, "cost" must include a minimum mark-up of 20% on the "sales price to the retailer."

The third and final tier in the pricing scheme addresses retail sales. Like the wholesaler the retailer is prohibited from selling any alcoholic beverage below "cost" which on spirits means the wholesaler's bottle price plus a minimum of 21 and ½% of the retailer's selling price; on cordials, the bottle price plus a minimum of 28% of the retailer's selling price; on wine, the bottle price plus a minimum of 33 and ⅓% of the retailer's selling price. While the manufacturer, or out of state shipper, is required to file with the Division of Liquor Control a list of suggested consumer resale prices[8] the retailer is specifically permitted to sell below the suggested resale price[9] as long as he does not sell below "cost", which includes the statutorily mandated minimum mark-up.[10] Plaintiffs claim that because the Connecticut Liquor Control Act permits the manufacturer, or out of state shipper, to unilaterally establish the initial price at which liquor will be sold in the State of Connecticut the Act constitutes resale price maintenance in illegal restraint of trade.

In support of their position plaintiffs rely on the Supreme Court's recent decision in *Cal. Liquor Dealers Ass'n v. Midcal Alum.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). *Midcal* involved a challenge to California's wine pricing scheme requiring wine producers to enter into trade contracts with wholesalers, or establish binding resale price schedules for wholesalers. A licensed wholesaler found to be selling below the price established by the manufacturer was subject to fines and/or other penalties.

---

**3.** "Each manufacturer, wholesaler and out-of-state shipper permittee shall post with the Division the bottle, can or case price of any brand of goods offered for sale in Connecticut, which price when so posted shall be the controlling price for such manufacturer, wholesaler or out-of-state permittee for the month following such posting." Conn.Gen. Stat.Ann. § 30–63.

**4.** Conn.Gen.Stat.Ann. §§ 30–63a–d.

**5.** Conn.Gen.Stat.Ann. § 30–68i.

**6.** *See* note 3, *supra.*

**7.** Conn.Gen.Stat.Ann. §§ 30–68e–h.

**8.** Conn.Gen.Stat.Ann. § 30–64 & § 30–68c.

**9.** Conn.Gen.Stat.Ann. § 30–64(b) & 30–68c. These two sections remove any binding effect the manufacturer may have on controlling resale prices. Were it otherwise you would have a situation more analogous to the pricing system struck down in *Cal. Liquor Dealers Ass'n v. Midcal Alum.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) where the wholesaler's resale price schedule was binding on the retailer. The only constraints imposed upon wholesalers and retailers under the Connecticut scheme are those imposed by the State itself.

**10.** A more detailed analysis of Connecticut's Distribution and Pricing scheme may be found in the *Report of the Liquor Price Fixing Investigation Commission to the 1978 Session of the Connecticut General Assembly*; see Defendant's Response and Cross-Motion for Summary Judgment in B–80–297 Appendix E.

The California Supreme Court, in striking down a parallel restriction in the sale of distilled liquors, stated that

> [I]n the price maintenance program before us, the state plays no role whatever in setting the retail prices. The prices are established by the producers according to their own economic interests, without regard to any actual or potential anticompetitive effect; the state's role is restricted to enforcing the prices specified by the producers. There is no control or 'pointed re-examination,' by the state to insure that the policies of the Sherman Act are not 'unnecessarily subordinated' to state policy.

*Midcal, supra,* at 100–101, 100 S.Ct. at 941, quoting, *Rice v. Alcoholic Beverage Control Appeals Bd.,* 21 Cal.3d 431, 445, 146 Cal. Rptr. 585, 595, 579 P.2d 476, 486 (1978). The Supreme Court had little trouble in finding the California Court's characterization of the distilled liquor regulations in *Rice* equally applicable to California's wine pricing scheme. *Midcal* held that

> California's system for wine pricing plainly constitutes resale price maintenance in violation of the Sherman Act. [Citations omitted]. The wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers. As Mr. Justice Hughes pointed out in *Dr. Miles,* [*Medical Co. v. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376 [55 L.Ed. 502] (1911)] such vertical control destroys horizontal competition as effectively as if wholesalers 'formed a combination and endeavored to establish the same restrictions . . . by agreement with each other.' [Citation omitted].

*Midcal, supra,* 445 U.S. at 103, 100 S.Ct. at 942. It is the ability of a private party, by contract, combination, or conspiracy to control the price at which another private party can sell a product which the Sherman Act prohibits. *Albrecht v. Herald Company,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis &*

*Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 51–55 (2d Cir. 1980). There was no dispute in *Midcal* that the California wine pricing scheme fell within the purview of the Sherman Act. The defendant, however, relied on the State of California's involvement in the price-setting program to provide it with an exemption from antitrust liability under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). As *Parker* and *Midcal* make clear, however, the applicability of any exemption, or immunity to the antitrust laws is only to be considered after first having found that a violation of the Sherman Act exists.

■ Connecticut's liquor pricing scheme is facially valid. The Liquor Control Act neither permits nor sanctions private parties engaging in resale price maintenance in violation of the Sherman Act. The only price not controlled by the State of Connecticut is the initial offering price established by manufacturers, or out of state shippers, subject to Connecticut's Affirmation statute.[11] The manufacturer, or out of state shipper, does not control the price charged by wholesalers to retailers, or by retailers to consumers. The mere fact that the manufacturer's price constitutes part of the wholesaler's and retailer's statutorily defined "cost" does not constitute any contract, combination, or conspiracy which the Sherman Act was intended to address. If one were to accept plaintiffs' argument nothing short of a complete monopolization of the industry by the State could escape Sherman Act liability. *E. g., Midcal, supra,* 445 U.S. at 106 n.9, 100 S.Ct. at 943 n.9.

■ *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), held that the federal antitrust laws do not prohibit a State "as sovereign" from imposing certain anti-competitive restraints "as an act of government." *Id.,* at 352, 63 S.Ct. at 314. It is clear that Connecticut's liquor pricing

---

11. New York's affirmation statute was upheld by the Supreme Court in *Joseph E. Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966). Connecticut's af-firmation statute is substantially the same as New York's and is not being challenged in this action.

scheme does impose certain anti-competitive restraints on wholesalers and retailers. It is equally clear, however, that the most liberal application of the Sherman Act to "State related" conduct itself, see *City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); see also *Star Lines, Ltd. v. Puerto Rico Maritime Ship. Auth.*, 451 F.Supp. 157, 163 n.31 (S.D.N.Y.1978), does not apply to Connecticut's pervasively state controlled liquor pricing law. No matter how one wishes to characterize the effect of the private manufacturer's innocuous role in Connecticut's pricing scheme, in terms of Sherman Act liability, a brief analysis of *Parker* and its progeny lends additional support to the Court's finding that the State, if it were necessary,[12] is entitled to invoke *Parker's* immunity.

In *Parker v. Brown, supra*, a California producer and packer of raisins sought to enjoin the State Department of Agriculture from enforcing a marketing program for the 1940 raisin crop. The California Agricultural Prorate Act of 1933, *as amended*,

> authorizes the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, so as to restrict competition among the growers and maintain prices in the distribution of their commodities to packers. The declared purpose of the act is to 'conserve the agricultural wealth of the State' and to 'prevent economic waste in the marketing of agricultural crops' of the state.

317 U.S. at 346, 63 S.Ct. at 311. Establishment of any marketing program is initiated by petition of no less than ten *private* producers. A program marketing committee, made up of producers, is then assigned to develop a program. Before any program takes affect it must be approved by the Commission and "consented to by 65 per cent in number of producers in the zone owning 51 per cent of the acreage devoted to production of the regulated crop...." 317 U.S. at 347, 63 S.Ct. at 311. Brown claimed that the program amounted to a contract, combination and conspiracy in restraint of trade and an attempt to monopolize the raisin industry in violation of sections 1 and 2 of the Sherman Act.

The Court held that because the program was imposed upon the industry by the State of California, acting 'as sovereign', and because the State, through the Commission, prescribed and enforced the conditions of its application, "[t]he State ... made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." *Id.*, at 352, 63 S.Ct. at 314. Most important to the challenge made by plaintiffs in the case at bar, the Court found:

> The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by force of agreement or combination which the Sherman Act prohibits. *Id.*

The role played by liquor manufacturers in establishing wholesale and retail prices under the Liquor Control Act does not approach the level of "non-official" participation granted to and required of private parties under the program challenged in *Parker.* More importantly, because the

---

12. While individual members of the Division of Liquor Control, Department of Business Regulation for the State of Connecticut are named as defendants, both individually and in their official capacity, see ¶ 3 of plaintiff's complaint in B–80–297, their is no claim being asserted that these persons engaged in any unlawful conduct. They merely personify the enforcement and regulatory powers granted under the Liquor Control Act. There is no need to engage in any subtle niceties to state that plaintiff's claims are against the State of Connecticut. See *Bates v. State Bar of Arizona*, 433 U.S. 350, 361, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810 (1977); Note, *Parker v. Brown Revisited: The State Action Doctrine After Goldfarb, Cantor, and Bates*, 77 Colum.L.Rev. 898, 910 (1977) [hereinafter cited as *Parker v. Brown Revisited*]. Who is the defendant serves to focus attention on the party responsible for promulgating, enacting and enforcing the challenged law. It also guides the Court in a proper analysis and application of the *Parker* doctrine. See *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 591–592, 96 S.Ct. 3110, 3118, 49 L.Ed.2d 1141 (1976).

State of Connecticut created its program pursuant to an articulated governmental policy,[13] and oversees, reviews and enforces the program by threat of sanctions, no private party is capable of imposing their will upon others by means violative of the Sherman Act.

Thirty-two years after *Parker*, beginning with *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court began to define and delineate the scope and application of *Parker*. See *Cal. Retail Liquor Dealers Ass'n v. Midcal Alum.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980); *New Motor Vehicle Bd. of Calif. v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *City of LaFayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). The Supreme Court has found the *Parker* exemption warranted in only *Orrin* and *Bates*.[14]

In *Orrin* the California Automobile Franchise Act required state approval of the location of new dealerships if an existing franchisee protests. In finding the Act entitled to antitrust exemption under *Parker* the Court found

> The Act does not lose this exemption simply because, as part of its regulatory framework, it accords existing dealers notice and an opportunity to be heard before their franchisor is permitted to locate a dealership likely to subject them to injurious and possibly illegal competition.

439 U.S. at 110, 99 S.Ct. at 412.[15] Similarly the fact that liquor manufacturer's set the

---

**13.** Plaintiffs claim that "Connecticut's Liquor Control Act contains no statement of the underlying legislative policy or the objects sought to be accomplished," Plaintiff's Memorandum in B-80-297, filed Nov. 17, 1980 at 11, thereby failing to meet the first of *Midcal's* two-pronged test. *Midcal, supra* [445 U.S.] at 105, 100 S.Ct. at 943. This statement is incorrect. Neither *Midcal*, nor any case before it requires the expression of state policy to take the form of a preface or section of the regulation or statute in question. One purpose, to create a minimum price at which liquor may be sold, is self evident. There is also an abundant legislative history of the present and prior liquor laws, *see* Defendant's attachment of Vacchelli affidavit, filed Jan. 23, 1981, attesting to its purpose of, *inter alia*, promoting temperance and stable market conditions. *See for example* 1963 Connecticut General Assembly Senate Proceedings at 1807–1810. Whether these purposes and the Act's accomplishment of them, are good, bad or effective is not capable of determination by this Court, or necessary to its decision. *See* note 16, *infra*.

**14.** *Parker* has been applied with varying results by lower courts prior to *Goldfarb*, see *Parker v. Brown Revisited, supra*, n.12 at 899 n.7 and subsequent to *Midcal; Community Communications Co. v. City of Boulder*, 630 F.2d 704 (10th Cir. 1980); *Hinshaw v. Beatrice Foods, Inc.*, [1980–1 Trade Cas. ¶ 63,584] (D.Mont. 1980); *North v. New York Telephone Co.*, [1980–1 Trade Cas. ¶ 63,675] (S.D.N.Y.1980); *Little Rock School District v. Borden, Inc.*, 505 F.Supp. 77 (E.D.Ark.1980); *Zinner v. Connecticut State Dental Commission*, No. B–78–439 (D.Conn. May 1, 1980); *Health Care Equaliza-*

*tion v. Iowa Medical Soc.*, 501 F.Supp. 970 (S.D.Iowa 1980); *Pueblo Aircraft Serv. v. City of Pueblo, Colo.*, 498 F.Supp. 1205 (D.Colo. 1980); *Associated Tel. Answering Exch. v. Am. Tel. & Tel.*, 492 F.Supp. 921 (E.D.Pa.1980); *In re Taylor Drug Stores, Inc.*, Order No. E–684–F, Ky. ABC Board (Dec. 18, 1980), 995 Antitrust & Trade Reg. Rep. (BNA) § D–1. *Bally Manufacturing Corp. v. New Jersey Casino Control Commission*, 85 N.J. 325, 426 A.2d 1000 (1981); *Minnesota-Iowa Television Co. v. Watohwan T. V. Improvement Assoc.*, Minn., 294 N.W.2d 297 (1980). For an excellent synopsis of the Supreme Court's application of *Parker* through *Lafayette* see *Star Lines, Ltd. v. Puerto Rico Maritime Ship. Auth.*, 451 F.Supp. 157, 162–166 (S.D.N.Y.1978) (Carter, J.).

**15.** The Court noted that "Dealers who press sham protests before the New Motor Vehicle Board for the sole purpose of delaying the establishment of competing dealerships may be vulnerable to suits under the federal antitrust laws." [Citation omitted]. 439 U.S. at 110 n.15, 99 S.Ct. at 412 n.15. This Court believes that what is really behind the Supreme Court's clear articulation and active supervision test announced in *Midcal*, to successfully invoke *Parker* protection, is the fear that "a gauzy cloak of state involvement" only creates a "sham" for "what is essentially a private price fixing arrangement." When the facts of *Midcal, Lafayette, Cantor* and *Goldfarb* are placed beside those of *Bates, Orrin* and *Parker* it is readily apparent that the Supreme Court saw the essential private, proprietary interest seeking to shield itself from liability—resulting in denying antitrust immunity and causing the

initial bottle price for their commodity does not constitute the injurious effect the Sherman Act was intending to address. It is not the liquor manufacturer who creates the anti-competitive pricing laws, or who has the means or influence delegated to it to institute minimum mark-up laws—it is solely the act of the State of Connecticut.

*Bates* involved a suit against the State Bar of Arizona, a state Agency, claiming antitrust violations in the promulgation and enforcement of a ban on attorney advertising. First, the Court avoided deciding the applicability of *Parker* when a state agency, or other quasi-state entity is the real party in interest, *see Lafayette* and *Cantor, supra*, having found that plaintiff's claims were against the state of Arizona since the Arizona Supreme Court was the real party in interest. *Bates, supra*, 433 U.S. at 361, 97 S.Ct. at 2697. The fact that the State Bar played a part in the enforcement process did not negate the essential 'sovereignty' of enforcing the disciplinary rule prohibiting attorney advertising.

> Although the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the appellee acts as the agent of the court under its continuous supervision.

*Id.* For purposes of assessing whether the ban was truly a matter wherein the state sought to exercise its authority and control or a disguise for usurpation by the State Bar, *see Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court, in distinguishing *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 584–585, 96 S.Ct. 3110, 3114–3117, 49 L.Ed.2d 1141 (1976), found "a clear articulation of the State's policy" and the subject of attorney conduct historically a matter of a "State's oversight." *Bates, supra*, 433 U.S. at 361–362, 97 S.Ct. at 2698. This amalgam of facts and holdings has found a semblance of order in *Midcal's* two-pronged test:

> creation of the two-pronged test in *Midcal*. The history of each case provides the best insight to the meaning of the legal test for *Parker* immunity and must not be viewed solely within the factual vacuum wherein it is announced.

First the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself. [Citation omitted].

445 U.S. at 105, 100 S.Ct. at 943. Both of these standards are satisfied in the present case.

The Liquor Control Commission, which enforces the Liquor Control Act, is one of six commissions established under the Department of Business Regulation, Conn. Gen.Stat.Ann. § 4c–1 *et seq.* The Commissioners are appointed by the Governor for six year terms, Conn.Gen.Stat.Ann. § 30–2, and are subject to removal for cause. Conn.Gen.Stat.Ann. § 4–12. No Commissioner or employee of the commission may have any interest or derive any profit from the liquor industry. Conn.Gen.Stat.Ann. § 30–4. Pursuant to Conn.Gen.Stat.Ann. § 30–6 the Commission has the power and duty to enforce the Act and make all necessary regulations to that end. It may declare a state of emergency, call upon any other department of state government for assistance and do whatever else is "reasonably necessary for the carrying out of the intent of ... [the Act]." Pursuant to Conn.Gen.Stat.Ann. § 30–8 the Commission is authorized to conduct all necessary inquiries and investigations and to hold hearings with the power to subpoena witnesses and documents, to administer oaths, and to take testimony. The Commission is responsible for the award, transfer, suspension or revocation of all liquor permits. Conn.Gen. Stat.Ann. § 30–15–62a.

The clear articulation and active supervision requirements of *Midcal* are self-evident from the statutory scheme in question. Moreover liquor regulation in Connecticut is a clear exercise of the State's power to protect the public [16] in an area having his-

---

16. As the Court noted earlier, *see* note 13, *supra*, whether promotion of temperance and preservation of orderly market conditions are justified is irrelevant to the Court's decision. The validity of these asserted justifications of the liquor pricing law is only to be questioned upon a finding that antitrust violations are oc-

toric roots.[17] The means employed by the State of Connecticut to effectuate their policy is not comparable to the wine pricing scheme at issue in *Midcal*. It is rather more akin to *Parker* and entitled to immunity.

Regardless of the existence of 'State Action' immunity the Court must address the question of ultimate preemption of Connecticut's liquor pricing law by the federal policy favoring open competition.[18] The Supreme Court has recently synthesized the cautionary approach courts must take in this area:

Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' [Citations omitted]. The underlying rationale of the pre-emption doctrine, as stated more than a century and a half ago, is that the Supremacy Clause invalidates state laws that 'interfere with, or are contrary to, the laws of Congress . . . .' [Citation omitted]. The doctrine does not and could not in our federal system withdraw from the States either the 'power to regulate where the activity regulated [is] merely a peripheral concern' of federal law, [citation omitted], or the authority to legislate when Congress could have regulated 'a distinctive part of a subject which is peculiarly adapted to local regulation . . . but did not,' [citation omitted].

*Chicago and North Western Transportation Co. v. Kalo Brick & Tile Co.*, —— U.S. ——, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). While Connecticut's liquor pricing law is sufficiently inter-state for purposes of antitrust analysis, *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 386, 71 S.Ct. 745, 746, 95 L.Ed. 1035 (1951), the law's wholly intrastate character severely weakens if not wholly eliminates conflict with the Commerce Clause. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 136–137, 98 S.Ct. 2207, 2219, 57 L.Ed.2d 91 (1978); *Parker v. Brown*, 317 U.S. 341, 359–368, 63 S.Ct. 307, 317–322, 87 L.Ed. 315 (1943). In addition, as noted in *Parker*, "Congress could, in the exercise of its commerce power, prohibit a state from maintaining a . . . program like the present because of its effect on interstate commerce." 317 U.S. at 350, 63 S.Ct. at 313. It has not done so.

When *Parker* State Action is insufficient to protect a party, or State, from antitrust liability, Twenty-first Amendment arguments have remained historically failing. *Midcal, supra*, 445 U.S. at 106–114, 100 S.Ct. at 944–948. When, however, the State is protected by *Parker's* immunity; no Sherman Act violation exists; and the character of the activity being challenged is intrastate, the Twenty-first Amendment is a powerful shield against federal usurpation. *Compare Kassel v. Consolidated Freightways Corp.*, —— U.S. ——, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981).

The absence of any facial antitrust violation in the Liquor Control Act itself, or in its enforcement by the Liquor Control Commission; the narrow intrastate application of the law; no Congressional usurpation, or expressed national interest in liquor control; "wide latitude" granted to the

---

curring, and thereby necessitating a balancing of the national policy in favor of competition and the State's rights guaranteed by the Twenty-first Amendment. There can be no question, however, that these interests have a basis in tradition for the asserted purpose of public benefit.

**17.** U.S.Const. amend. XXI, § 2.

The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

**18.** Resolution of this issue is not to be confused with the balancing approach used by the Supreme Court in *Midcal* to determine whether the Twenty-first Amendment together with California's articulated, but unjustified reliance on temperance and preservation of orderly market conditions, was sufficient to override the national interest in competition. Primal to the Court's analysis was the fact that California's wine pricing scheme was violative of the Sherman Act.

States by the courts in light of the Twenty-first Amendment, all balanced against a national policy in favor of competition expressed through a federal law aimed at essentially private conduct causes this Court to decline to engage in economic interference with State legislative policy absent the opprobrious conduct found to exist in *Schwegmann Brothers, supra,* or the clear conflict with the Constitution found in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1970) and *Department of Revenue v. James Beam Co.,* 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964).

It is accordingly the judgment of this Court that plaintiffs' motion for summary judgment be DENIED and defendants' cross-motion for summary judgment be GRANTED.

It is SO ORDERED.