Jasen, J.
(concurring). While I agree with the majority that the 21st Amendment shields the challenged regulatory scheme from antitrust liability (Battipaglia v New York State Liq. Auth., 745 F2d 166, 168-170, affg 583 F Supp 8, cert denied_US_, 105 S Ct 1393), I concur in reversing the order of the Appellate Division upon two additional grounds. I believe that the State activity in controlling the sale of alcoholic beverages does not contravene Federal antitrust policy, and is, in any event, immunized from antitrust liability by the state action doctrine.
The threshold question is whether New York’s liquor price maintenance program violates the Sherman Antitrust Act (15 USC § 1). (California Liq. Dealers v Midcal Aluminum, 445 US 97, 102.) The Sherman Act provides, in pertinent part, that “[ejvery contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal”. (15 USC § 1.) Section 1 of the Sherman Act is directed only at joint action and does not proscribe independent business actions and decisions. (Modern Home Inst. v Hartford Acc. & Indem. Co., 513 F2d 102, 108-109.) The statute embraces a fundamental distinction between concerted and independent action. (Copper-weld Corp. v Independence Tube Corp., 467 US_, 104 S Ct 2731, 2740.) Unlike the California statute in Midcal, the New York regulatory scheme does not authorize or compel private parties to enter contracts or combinations in restraint of trade, nor does it condone agreements between independent businessmen. (Morgan v Division of Liq. Control, 664 F2d 353, 355, affg sub nom. Serlin Wine & Spirit Merchants v Healy, 512 F Supp 936; see, Fuchs Sugars & Syrups v Armstar Corp., 602 F2d 1025, 1029, cert denied 444 US 917.) A wholesaler may freely set prices under the New York regulatory system; his conduct is strictly unilateral.[1] The language of the Sherman Act should not be extended to preempt a system of state regulation where the challenged conduct involves a matter of special state interest (US Const 21st amend), and there is no agreement or joint action in restraint of trade at issue.
The Supreme Court has traditionally been hesitant to apply the Sherman Act in a manner which would defeat the policy of a *525 State. (United States v Frankfort Distilleries, 324 US 293, 299 [Black, J.].) This is especially true in the field of liquor control within state borders, where the 21st Amendment, as a matter of constitutional law, accords state regulation of alcoholic beverages a preferred status. (United States v Frankfort Distilleries, 324 US 293, 300-301, supra [Frankfurter, J., concurring].) Programs of state regulation, such as the challenged liquor pricing scheme, whose anticompetitive efforts are felt wholly within the enacting states, should be beyond the reach of the Sherman Act. (See, Easterbrook, The Court and the Economic System, 98 Harv L Rev 4, 51, n 120; Easterbrook, Antitrust and Economics of Federalism, 26 J L & Econ 23.) The statute’s wholly intrastate character virtually eliminates any conflict with the antitrust laws enacted on authority of the Commerce Clause (Serlin Wine & Spirit Merchants v Healy, 512 F Supp 936, 943, affd sub nom. Morgan v Division of Liq. Control, 664 F2d 353, supra; cf. Battipaglia v New York State Liq. Auth., 745 F2d 166, 172, n 9, cert denied_US_, 105 S Ct 1393, supra).
Moreover, the aim of the antitrust laws, the maximization of consumer welfare,[2] is not hindered by New York’s liquor pricing scheme. As aptly demonstrated by the majority (at pp 513-514), the scheme protects consumer interests by avoiding an integrated system of liquor distribution. Economic liberty in New York’s liquor industry is of paramount state concern, and New York’s system of regulation is not to be preempted by the Federal antitrust laws simply because it might hypothetically have an anticompetitive effect. (Rice v Williams Co., 458 US 654, 659.) This State’s regulatory scheme may be easily reconciled with section 1 of the Sherman Act (15 USC § 1; cf. Matter of Admiral Wine & Liq. Co. v State Liq. Auth., 61 NY2d 858, modfg 89 AD2d 522), by recognizing that: the regulatory scheme is of a clear intrastate character, no question of joint action in restraint of trade is involved, the distribution of alcoholic beverages has been constitutionally denominated a matter of proper concern for the States, and New York’s liquor pricing scheme is congruous with the Federal policy favoring competition. Thus, Federal antitrust policy has not realistically been contravened by New York’s regulation of liquor prices.
In the event that the operation of New York’s liquor pricing system is thought to implicate Federal antitrust interests, the “state action” doctrine immunizes this State’s scheme from *526 antitrust liability. (Parker v Brown, 317 US 341; see also, Olsen v Smith, 195 US 332.) Application of the state action exemption is contingent upon satisfaction of the two-part standard set forth in California Liq. Dealers v Midcal Aluminum (445 US 97, 105, supra): “First, the challenged restraint must be ‘one clearly articulated and affirmatively expressed as state policy’; second, the policy must be ‘actively supervised’ by the State itself. City of Lafayette v Louisiana Power & Light Co., 435 U. S. 389, 410 (1978) (opinion of Brennan, J.) [n omitted].” Inasmuch as there is no question that this challenged liquor pricing scheme represents a clearly articulated and affirmatively expressed State policy, I turn to the question whether there has been active State supervision of the pricing scheme. Under Midcal, simply authorizing price setting and enforcing the prices established by private parties are insufficient state acts to confer Parker immunity. Rather, the Supreme Court establishes the following state actions which may be deemed indicia of active state supervision: price establishment, review of the reasonableness of the price schedules, regulation of the terms of fair trade contracts, the monitoring of market conditions, or any pointed reexamination of the program. (Midcal, supra, at pp 105-106.)
The Supreme Court’s clear articulation and active supervision test is intended to prevent the “casting * * * [of] a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement”. (Midcal, supra, at p 106; see also, Serlin Wine & Spirit Merchants v Healy, 512 F Supp 936, 941-942, n 15, affd sub nom. Morgan v Division of Liq. Control, 664 F2d 353, supra.) The test was borne of “the widespread perception that resourceful lawyers and ambitious state officials had built on the precepts of Parker so creatively that large and important areas of each state’s economy were alleged to be protected from antitrust scrutiny by what must have seemed in some cases to be a rather flimsy veil of state action”. (Shenefield, The Parker v Brown State Action Doctrine and The New Federalism of Antitrust, 51 Antitrust LJ 337, 340.) The posture of the instant appeals before this court is markedly different than the typical controversies in which private parties seek to invoke Parker immunity. Here, we are not presented with an attempt by a private party to seek safe harbor within the state action exemption. Rather, antitrust immunity is sought to be invoked by an instrumentality of the State on behalf of private entities, which has acted in a sovereign capacity, pursuant to clear legislative command. I submit that within the context of this action, the concerns sought to be remedied by the Midcal test are simply not present. The second *527 test of Midcal has, in any event, been met by the State Liquor Authority’s active supervision of the pricing scheme.
The case of Morgan v Division of Liq. Control (supra) is instructive as to the resolution of the question whether there has been active state supervision of the challenged program. Of critical importance in the Second Circuit’s determination that Connecticut’s statutory regulation of the price of alcoholic beverages was actively supervised by that State was the fact that Connecticut established a minimum mark-up upon each type of alcoholic beverage offered for sale. (Morgan v Division of Liq. Control, 664 F2d 353, 355-356, supra.) In New York, a closely analogous statutory mark-up is directly imposed by the State. Off-premises retailers are generally not authorized to sell liquor at a price which is less than “cost” (Alcoholic Beverage Control Law § 101-bb [2].) “Cost” is defined as “the price of such item of liquor to the retailer plus twelve percentum of such price, which is declared as a matter of legislative determination to represent the average minimum overhead necessarily incurred in connection with the sale by the retailer of such item of liquor.” (Alcoholic Beverage Control Law § 101-bb [2] [b] [emphasis added].)
It has been said that a state sales-below-cost statute, which mandates minimum mark-ups, constitutes adequate supervision by the state, since the provision “not only reflects a legislative judgment that retailers should be required to charge certain minimum prices, but reflects a judgment as to what those prices should be.” (Posner, The Proper Relationship Between State Regulation and the Federal Antitrust Laws, 49 NYU L Rev 693, 722.) The 12% mark-up, as well as the requirement that manufacturers or distillers may only sell at prices which are no higher than the lowest prices charged wholesalers in any other state (Alcoholic Beverage Control Law § 101-b [3]), represent legislative policy determinations to displace unfettered competition at two critical stages of the distributive chain. Such restrictions constitute active state supervision.
The Supreme Court has held that active state supervision may be established if the state “monitor[s] market conditions” or engages in any “pointed reexamination” of the pricing program. (California Liq. Dealers v Midcal Aluminum, 445 US 97, 106, supra.) In order to closely tailor the regulatory scheme to changing market conditions, the State Liquor Authority has conducted careful reexaminations of the price maintenance program. For example, Bulletin 471, which has been challenged and upheld on the instant appeal (majority opn, at pp 522-523), *528 advises wholesalers that “there developed a situation during post-off periods which resulted in what became known as a ‘two bottle’ price. The Authority has recognized this as undesirable, if not illegal”. This policy statement manifestly demonstrates that the Authority both “monitor[s] market conditions” and engages in “pointed reexamination”, thus satisfying the Midcal requirement of active state supervision. Moreover, the Authority is authorized to respond to market forces in individual cases where wholesalers or retailers are aggrieved. Alcoholic Beverage Control Law § 101-b (3) (b) provides that a wholesaler may pass through increased costs of labor or other operating costs on the written permission of the Authority, for good cause shown and for reasons not inconsistent with the Alcoholic Beverage Control Law. Also, wholesalers may be relieved of selling at the posted price if the prior written permission of the Authority, upon good cause shown, is secured. (Alcoholic Beverage Control Law § 101-b [3] [b].) A retailer may offer to sell liquor at a price less than cost provided that prior written permission therefor is granted by the Authority for good cause shown and for reasons not inconsistent with the Alcoholic Beverage Control Law and under such terms and conditions as the Authority deems necessary. (Alcoholic Beverage Control Law § 101-bb [3].) The State Liquor Authority may determine the continued desirability of certain proscriptions as applied to the industry at large, or in individual cases involving hardships upon retailers and wholesalers. Such determinations, which respond to changing market conditions, are strong evidence of continuing regulatory supervision of the liquor pricing scheme. (See, Morgan, Antitrust and State Regulation: Standards of Immunity After Midcal, 35 Ark L Rev 453, 470.)
Another indicia of active state supervision is evidence that the Legislature has frequently debated the merits of the pricing system. (Morgan v Division of Liq. Control, 664 F2d 353, 355, supra.) It cannot be seriously disputed that the legislative branch has periodically conducted a “pointed reexamination” of the challenged program. (California Liq. Dealers v Midcal Aluminum, 445 US 97, 106, supra.) As well established by the majority (at pp 518-520), New York’s pervasive regulation of the distribution of alcoholic beverages is the result of extensive legislative hearings during the last two decades. (See, House of Spirits v Doyle, 72 Misc 2d 1036, affd 43 AD2d 880, affd 36 NY2d 815, supra.) Indeed, the liquor pricing program of this State remains a subject of substantial controversy in the New York State Legislature. (See, e.g., Vol 1, 1985 NY Legis Digest, A 5151; 1984 NY Legis Record and Index, S 6541; Page, Antitrust, *529 Federalism, and the Regulatory Process: A Reconstruction and Critique of the State Action Exemption After Midcal Aluminum, 61 BU L Rev 1099, 1136, n 210.) There can be no question that the challenged program has historically and periodically been subjected to pointed reexamination by means of official, legislative oversight.
Based upon the 12% minimum mark-up imposed upon the price of liquor to be sold by the retailer, the monitoring of market conditions affecting the liquor industry and individuals, the pointed reexamination of the pricing scheme by the executive and legislative branches, and the substantial legislative debate upon the pricing scheme, I would hold that there exists continuous and active state supervision of the regulatory scheme so as to confer antitrust immunity.

. Other courts have recognized that antitrust liability for minimum mark-up statutes does not attach where the statutes do not immunize or implement agreements to restrain trade. (See, e.g., Fisher Foods v Ohio Dept. of Liq. Control, 555 F Supp 641; Little Rock School Dist. v Borden, Inc., 1980-2 Trade Cas [CCH], fl 63,493 [ED Ark, Aug. 5,1980]; Cochran Co. v Comptroller, 292 Md 3, 437 A2d 194; Walker v Bruno’s, Inc., 650 SW2d 357 [Tenn].)

. See, Posner, Antitrust Laws: An Economic Perspective, at 8, 18-20; Bork, The Antitrust Paradox: A Policy at War With Itself, at 81; 1 Areeda & Turner, Antitrust Law, at ¶¶103-105.)