## HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INC., et al.

v.

## PENNSYLVANIA HORSE RACING COMMISSION, et al.

Civ. A. No. 81–1992.

United States District Court,
E. D. Pennsylvania,
Civil Division.

Jan. 8, 1982.

Richard P. Brown, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiffs.

David H. Allshouse, Deputy Atty. Gen., Harrisburg, Pa., Richard M. Bernstein, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendants.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

This case is the third action brought by horse owners and/or trainers to challenge Rule 9.15 of the Pennsylvania Horse Racing Commission ("Commission") which sets fees to be paid to jockeys who ride at racetracks in the Commonwealth. The first case was brought in late 1978 in the Commonwealth Court of Pennsylvania by the Pennsylvania Division of the Horsemen's Benevolent and Protective Association ("HBPA")[1], one of the plaintiffs in the instant action, and other horse owners and trainers claiming, *inter alia*, that the Commission lacked authority

under the Horse Racing Act, Pa.Stat.Ann. tit. 15, §§ 2651–2675 (Purdon Supp. 1981–82), to regulate jockey fees. This action resulted in a decision of the Pennsylvania Supreme Court in *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 422 A.2d 487 (1980), holding that the Commission was authorized by the Legislature to set jockey fees.

*Euster v. Pennsylvania Horse Racing Commission*, Civil Action No. 79–265, was a second action brought in this Court in January of 1979, alleging, *inter alia*, that the Commission rule which sets fees to be paid to jockeys violates Section 1 of the Sherman Act, 15 U.S.C. § 1. On July 9, 1981, in light of the Pennsylvania Supreme Court's decision in *Gilligan, supra*, this Court granted summary judgment for the defendants on the ground that they were immune from antitrust liability by the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Finally, this instant action was brought in May, 1981, by the HBPA and three other horse owners against the Horse Racing Commission, its members, and the Jockeys' Guild.[2] Counsel for these plaintiffs also represented the plaintiffs in the *Gilligan* and *Euster* case when they filed this action. At that time, the *Euster* action was still pending and plaintiffs' counsel requested the Court to dismiss the prior action pursuant to Federal Rule of Civil Procedure 41(a)(2). In support of their motion, plaintiffs asserted that the two actions raised the identical issue, *i.e.*, whether Rule 9.15 of the Rules of Racing violated the Sherman Act, and that because the new complaint more "fully delineate[d] the antitrust issues" raised in *Euster*,[3] the earlier complaint should be disregarded. The Court denied the plaintiffs' motion for voluntary

---

**1.** The HBPA is an organization which represents owner-trainers of race horses at various race tracks in the United States, including Pennsylvania. *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 94 n.3, 422 A.2d 487, 489 n.3 (1980).

**2.** The Jockeys' Guild "is a national organization which represents approximately 1500 jock-

eys, including the majority of those actively riding in Pennsylvania." *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 94 n.1, 422 A.2d 487, 488 n.1 (1980).

**3.** Plaintiff's Motion for Dismissal pursuant to Fed.R.C.P. 41(a)(2), ¶ 6.

dismissal but instead granted defendants' pending motion for summary judgment in the *Euster* action.

The plaintiffs seek to maintain the present action as a class action on behalf of "all horse owners whose horses have raced at racetracks within the Commonwealth of Pennsylvania since November 25, 1978...." Complaint ¶ 8. Essentially, plaintiffs' factual allegations are that on March 1, 1978, the members of the Jockeys' Guild agreed among themselves on a proposed schedule of fees to be paid to jockeys; that on June 26, 1978, the Guild wrote a letter to the Horse Racing Commission requesting that the Commission "adopt the Jockeys' Guild fee scale as the required schedule of payment for jockeys that race thoroughbred horses in Pennsylvania"; and that at a July 19, 1978 meeting, the Commission "voted unanimously to amend Rule 9.15 to conform exactly to the fee scale requested by the Jockeys' Guild." Complaint ¶¶ 16, 17, 22.

Plaintiffs allege that these facts establish that defendants violated the antitrust laws of the United States. Specifically, the complaint alleges the following:

> 36. By agreeing among themselves to set jockeys' fees, the jockeys who are members of the Jockeys' Guild have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.
>
> 37. By agreeing among themselves to set jockeys' fees in the absence of an express articulated Pennsylvania legislative policy to displace competition in the market for jockey services, the Racing Commission and its members and the Jockeys' Guild and its members have vio-

lated Section 1 of the Sherman Act, 15 U.S.C. § 1.

The Horse Racing Commission and its members have filed a motion to dismiss the complaint for failure to state a claim upon which relief can be granted.[4] The Jockeys' Guild has filed a separate Rule 12(b)(6) motion. I will consider the Commission's motion first.[5]

## I. THE COMMISSION'S MOTION TO DISMISS

■ The Commonwealth defendants base their Rule 12(b)(6) motion to dismiss on the basis of (1) the state-action exemption of *Parker v. Brown, supra,* and (2) the res judicata and/or collateral estoppel effect of this Court's decision in *Euster.* For the reasons herein stated, I hold that the Commonwealth defendants are immune from suit under the *Parker* doctrine and, accordingly, their motion to dismiss will be granted. I therefore need not reach the res judicata and collateral estoppel issues.

### A. Rule 9.15 and the *Gilligan* case.

The jockey fee schedule in dispute here was adopted in 1968 and remained unchallenged and unchanged until an increase in fees was requested by the Jockeys' Guild in June 1978. The fee schedule is contained in Rule 9.15 of the Rules of Racing, which are promulgated by the Commission pursuant to the Horse Racing Act. The Commission unanimously voted to amend the rule containing the fee schedule on July 19, 1978. Notice of the proposed amendment appeared in the Pennsylvania Bulletin on September 2, 1978, citing inflation as the primary justification for the increase. The

---

4. Fed.R.Civ.P. 12(b)(6). In determining whether this complaint states a claim upon which relief can be granted, the factual allegations of the complaint, as opposed to the legal conclusions that are alleged, must be taken as true, *Kugler v. Helfant,* 421 U.S. 117, 125 n.5, 95 S.Ct. 1524, 1531 n.5, 44 L.Ed.2d 15 (1975), and a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

5. The Commission and its members also filed a motion to dismiss for lack of jurisdiction over the subject matter pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that the Eleventh Amendment to the Constitution prohibits this Court from entertaining this suit. Since I will grant the Commonwealth defendants' Rule 12(b)(6) motion to dismiss, I will not consider the Rule 12(b)(1) motion based on the Eleventh Amendment.

amendment was subsequently adopted despite written and oral objections by the HBPA and other individuals. *See generally, Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 94–95, 422 A.2d 487, 488–89 (1980). These objectors petitioned for review of the Commission's decision in the Commonwealth Court claiming, *inter alia*, that the Commission lacked authority under the Horse Racing Act to regulate jockey fees. The Commonwealth Court agreed with the petitioners, 46 Pa. Commw. 595, 598, 407 A.2d 466, 468 (1979), but the Pennsylvania Supreme Court reversed, emphatically holding that the Commission was authorized by the Legislature to promulgate a jockey fee schedule. *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 422 A.2d 487 (1980). Justice Kauffman, writing for the court, stated that the Horse Racing Act expressly conferred broad rule making powers on the Commission which included the power to set jockey fees:

The Act reflects a clear legislative policy to vest the Commission with broad general supervisory powers over the previously unlawful activity of thoroughbred horse racing.... A pervasive system of regulation and supervision of this *otherwise criminal activity* was thus contemplated by the Commission's broad legislative mandate, and a general rule making power was clearly and unmistakably conferred....

....

... The breadth of the Commission's powers is required for the prevention of corruption and the maintenance of high standards and public confidence in racing. *The imposition of a jockey fee schedule is simply part of a comprehensive scheme of regulation consistent with—indeed, necessary to accomplish—those legislative goals.*

....

... Moreover, the Legislature's acquiescence in the Commission's exercise of its rule-making power to set jockey fees manifests approval thereof. Indeed, when the Legislature amended the Act in 1976, no effort was made to curtail that authority, even though the section enumerating the powers of the Commission (§ 2652) was among those amended. (Act of Dec. 2, 1976, P.L. 1249, No. 276, § 1).

*Id.* at 96–99, 422 A.2d at 489–90 (emphasis added).

B. Anticompetitive State Regulation, Substantive Due Process, and the *Parker* Doctrine.

Historically, state governments regulated the competitive sectors of the economy. As was noted by Chief Justice Waite in *Munn v. Illinois*, 94 U.S. 113, 24 L.Ed. 77 (1877), when the Court upheld an Illinois statute setting maximum warehouse charges for the storage of grain:

[I]t has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold.

*Id.* at 125, 24 L.Ed. 77.

In the years after *Munn v. Illinois*, the Supreme Court, applying the concept of the Fourteenth Amendment substantive due process, both sustained and invalidated a multitude of state enactments providing for price or wage control in such varied fields as insurance, milk, cream and butterfat, theatre tickets, the fees of employment agencies, weighing and handling of grain charges of stockyard companies, water rates, commissions of insurance agents, rent control, pipe line rates and the retail price of gasoline. See Handler, *The Current Attack on the Parker v. Brown State Action Doctrine*, 76 Colum.L.Rev. 1, 3–7 (1976). However, in *Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934), and in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), the Supreme Court reversed its earlier stance and held that the doctrine of substantive due process could not be used by the federal judiciary as a means to invalidate state

economic regulations. Justice Black summarized the Supreme Court's current position as follows:

> Under the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation. There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy. In this manner, the Due Process Clause was used, for example, to nullify laws . . . . setting minimum wages for women, *Adkins v. Children's Hospital*, 261 U.S. 525 [43 S.Ct. 394, 67 L.Ed. 785] (1923) . . . .
>
> . . . .
>
> . . . [This practice] has long since been disregarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, "We are not concerned . . . with the wisdom, need, or appropriateness of the legislation." . . . . It is now settled that States "have power to legislate against what are found to be injurious practices in their internal commerce and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law."
>
> . . . .
>
> . . . . We refuse to sit as a "superlegislature to weigh the wisdom of legislation," and we emphatically refuse to go back to the time when courts used the Due Process Clause "to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought."

*Ferguson v. Skrupa*, 372 U.S. 726, 729–31, 83 S.Ct. 1028, 1030–32, 10 L.Ed.2d 93 (1963) (citations and footnotes omitted). In short, if a state economic regulation bears a rational relation to a constitutionally permissible objective, then it cannot be invalidated by a federal court on the basis of the due process clause of the Fourteenth Amendment. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

When *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), was decided, the Court was still in the process of repudiating its previous reliance on the due process clause to police state regulatory activity. Verkuil, *State Action, Due Process and Antitrust: Reflections on Parker v. Brown*, 75 Colum.L.Rev. 328, 331 (1975).[6] In *Parker* a raisin packer sued the California State Agricultural Commission to enjoin enforcement of the State's Agricultural Prorate Act. The Act authorized the State Director of Agriculture and the Agriculture Commission to adopt marketing programs regulating the sale of certain produce. Plaintiff did not challenge the regulation on Due Process grounds, but rather attacked the program as a violation of the Sherman Act. The Court held that state regulatory programs, such as the one adopted by California, were immune from the provisions of the Sherman Act. Chief Justice Stone, writing for the Court, stated:

> But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to

---

**6.** *See City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (Burger, C. J., concurring):

The holding in *Parker* is perfectly understandable . . . in light of the historical period in which the case was decided. The Court

had then but recently emerged from the era of substantive due process, and was undoubtedly not eager to commence a new round of invalidating state regulatory laws on federal principles.

*Id.* at 421, 98 S.Ct. at 1141.

restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

*Id.,* 317 U.S. at 350–51, 63 S.Ct. at 313.

It is evident from the language of the above passage that the Supreme Court's chief reason for not subjecting state regulatory programs to the strictures of the Sherman Act was for the same reason the Court repudiated its former use of the due process clause to invalidate state economic regulations, *i.e.,* a fundamental consideration of federalism. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 103, 100 S.Ct. 937, 942, 63 L.Ed.2d 233 (1980); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 421, 98 S.Ct. 1123, 1140–41, 55 L.Ed.2d 364 (1978) (Burger, C. J., concurring); Verkuil, *supra,* at 334. As Chief Judge Robinson of the District of Columbia Court of Appeals recently wrote:

> In addressing state-action problems in the antitrust field, the Supreme Court has repeatedly emphasized that fundamental considerations of federalism underlie the exemption doctrine. Inherent in our system of government is the concept of dual sovereignty; each state is sovereign, except to the extent that its sovereignty is curtailed by the Constitution or validly restricted by Congress. It is for this reason that "an unexpressed purpose [in the antitrust laws] to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."

*Feldman v. Gardner,* 661 F.2d 1295, 1306–07 (D.C.Cir.1981) (quoting *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943)).

### C. The Progeny of *Parker.*

It was not until twenty-two years after *Parker,* beginning with *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), that the Supreme Court began to define and delineate the scope and application of *Parker.* In *Goldfarb,* the Court was confronted with the question of whether a minimum fee schedule created by the Fairfax County Bar Association, a voluntary association of lawyers, and enforced by the Virginia State Bar, a state agency by law, constituted price fixing in violation of Section 1 of the Sherman Act. One of the issues before the Court was whether the fee schedule was immune from antitrust attack under *Parker* because it was enforced by the State Bar. The Court held that the State Bar, by enforcing the fee schedule of the County Bar, had voluntarily joined in what was "essentially a private anticompetitive activity", and therefore the fee schedule was not beyond the reach of the Sherman Act. *Id.* at 791–92, 95 S.Ct. at 2015. The Court stated that it is not enough for *Parker* immunity to apply that a state agency approves or enforces the anticompetitive conduct of private parties; rather for immunity to attach, the anticompetitive conduct must originate with or be compelled by the State. *Id. Cf. Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943) ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful...")

In *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the defendant was a private utility company which furnished its residential customers with light bulbs without additional charge. This practice was approved, as part of the defendant's rate structure, by the Michigan Public Service Commission. The plaintiff, a retail druggist who sold light bulbs, brought an action against the utility, claiming that it was using its monopoly power in the distribution of electricity to restrain competition in the sale of light bulbs in violation of the Sherman Act. The District Court granted the defendant's motion for summary judgment, holding on the authority of *Parker v. Brown, supra,* that the Commission's approval of the utility's light bulb market practices exempted the practice

from liability under the Sherman Act. The Court of Appeals affirmed.

The Supreme Court reversed, holding that mere approval by the State of anticompetitive activity by private parties does not immunize such action under *Parker v. Brown* without a showing that the conduct was required by the State acting in its sovereign capacity. The Court found that neither the Michigan Legislature nor the Commission ever considered the desirability of the utility's light bulb program, 428 U.S. at 584, 96 S.Ct. at 3114; that other utilities regulated by the Commission did not have a light bulb program, *id.*; and that the decision on whether defendant was to have a light bulb program was entirely the defendant's not the Commission's, *id.* at 594, 96 S.Ct. at 3119. Since the utility's anticompetitive program was not compelled by the Legislature or the Commission, the defendant was not shielded from antitrust liability even though the Commission approved of such activity.

In *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court examined the question of whether a regulation of the Arizona Supreme Court that prohibited advertising by lawyers was immune from an antitrust challenge. The Court held that the rule was exempt by the state-action immunity of *Parker v. Brown.* In reaching this conclusion, the Court contrasted the bar-created fee schedule successfully attacked in *Goldfarb* and noted that the complaint in *Bates* was not anticompetitive behavior by lawyers as was alleged in *Goldfarb,* but a "restraint . . . 'compelled by direction of the State acting as a sovereign.'" *Id.* at 360, 97 S.Ct. at 2697 (quoting *Goldfarb,* 421 U.S. at 791, 95 S.Ct. at 2015). Moreover, the Court emphasized that the rule reflected "a clear articulation of the State's policy with regard to professional behavior" and that it was "subject to pointed re-examination by the policymaker—the Arizona Supreme Court—in enforcement proceedings." *Id.* at 362, 97 S.Ct. at 2698. The Court further remarked that because in *Bates* the State policy was "so clearly and affirmatively expressed" and the State's supervision was "so active",

its concern that "federal policy . . . [was] being unnecessarily and inappropriately subordinated to State policy" was alleviated. *Id.*

In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court held that under *Parker* cities operating power companies were not exempt from the Sherman Act merely because of their status as governmental entities. Nonetheless, the Court acknowledged that cities may be exempt if they are acting "pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. The Court held that the dispositive question is whether the anticompetitive activities are directed by the state; if they are not so directed, the state's subdivisions must obey the antitrust laws. *Id.* at 412–14, 98 S.Ct. at 1136–1137.

In *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), a California statute required an automobile dealer to secure the approval of the state Motor Vehicle Board before opening or relocating a dealership if an existing franchisee protested the new location. The plaintiff challenged the Act on the ground that allowing the protest of competing dealers to delay the establishment of dealerships gives effect to privately intended restraints on trade and is thus invalid as a violation of the Sherman Act. The Court responded to this argument by stating that the "Act's regulatory scheme is a system of regulation, clearly articulated and affirmatively expressed, designed to displace unfettered business freedom in the matter of the establishment and relocation of automobile dealerships." *Id.* at 109, 99 S.Ct. at 412. The Court therefore concluded, citing *Parker* and *Bates,* that the regulation was outside the reach of the antitrust laws under the "state action" exemption. The Court acknowledged the statute's potential for anticompetitive effects, but stated that an adverse effect on competition was not enough in and of itself to render the statute invalid. *Id.* at 111, 99 S.Ct. at 412.

The Supreme Court's most recent pronouncement on *Parker* immunity was in

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In *Midcal*, plaintiff challenged California's statutory wine pricing scheme requiring wine producers to enter into trade contracts with wholesalers or establish binding resale price schedules for wholesalers. A licensed wholesaler found to be selling below the price established by the manufacturer was subject to fines and/or other penalties. The plaintiff alleged that this scheme violated the Sherman Act. The Court reviewed its previous decisions on state-action immunity and from these cases gleaned the following two-pronged test for determining whether a particular state activity is entitled to antitrust immunity:

> These decisions establish two standards for antitrust immunity under *Parker v. Brown*. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself.

*Id.* at 105, 100 S.Ct. at 943 (citations omitted).

Applying these standards to the facts in *Midcal*, the Court found that California's system for wine pricing satisfied the first standard. The Court, however, held that the program did not meet the second requirement for *Parker* immunity, *i.e.*, that the State did not "actively supervise" the wine pricing scheme:

> The State simply authorizes price-setting and enforces the prices established by private parties. The State neither establishes prices nor reviews the reasonableness of the price schedules; nor does it regulate the terms of fair trade contracts. The State does not monitor market conditions or engage in any "pointed reexamination" of the program. The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.

*Id.* at 105–106, 100 S.Ct. at 943–944.

It is evident from the decisions of the Supreme Court that the Court's primary purpose in developing the clear articulation and active supervision test as pronounced in *Midcal* was to eliminate situations where essentially private interests gain immunity from the antitrust laws by inducing some involvement by the state in regulation which is basically protective of private interests. *See Benson & Gold Chevrolet, Inc. v. Louisiana Motor Vehicle Commission*, La., 403 So.2d 13, 24–25 (1981). As one court aptly stated:

> [W]hat is really behind the Supreme Court's clear articulation and active supervision test announced in *Midcal*, to successfully invoke *Parker* protection, is the fear that "a gauzy cloak of state involvement" only creates a "sham" for "what is essentially a private price fixing arrangement." When the facts of *Midcal, Lafayette, Cantor* and *Goldfarb* are placed beside those of *Bates, Orrin* and *Parker* it is readily apparent that the Supreme Court saw the essential private, proprietary interest seeking to shield itself from liability—resulting in denying antitrust immunity and causing the creation of the two-pronged test in *Midcal*.

*Serlin Wine & Spirit Merchants, Inc. v. Healy*, 512 F.Supp. 936, 941 n.15 (D.Conn.), *aff'd sub nom. Morgan v. Division of Liquor Control*, 664 F.2d 353 (2d Cir. 1981) (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106, 100 S.Ct. 937, 943–44, 63 L.Ed.2d 233 (1980)).

D. Application of the *Midcal* Standard to the Facts of the Instant Case.

Several courts and commentators have questioned whether the Supreme Court intended that the two-pronged *Midcal* test be applied to all state-emanated restraints on trade. *See e.g., Feldman v. Gardner*, 661 F.2d 1295, 1305 (D.C.Cir.1981); *Serlin Wine & Spirit Merchants, Inc. v. Healy*, 512 F.Supp. 936, 941 n.15 (D.Conn.), *aff'd sub nom. Morgan v. Division of Liquor Control*, 664 F.2d 353 (2d Cir. 1981); 6 J.Corp.L. 981, 692–94 (1981). The Commonwealth defendants, echoing these authorities, argue that because the Commission is a state agency,

which acted within its authority under the Horse Racing Act when it promulgated a jockey fee schedule, the *Midcal* standard is inapplicable here.

Neither the Supreme Court nor the Third Circuit has had occasion to consider the *Midcal* doctrine against the backdrop of the factual contours presented here.[7] Here, the Legislature granted broad authority to the Commission, an independent administrative state agency, to regulate and supervise "all pari-mutuel thoroughbred horse racing activities in the State." Pa.Stat.Ann. tit. 15, § 2651 (Purdon Supp.1981–82). The Commission consists of three members who are appointed by the Governor with the advice and consent of the Senate to serve a three year term. *Id.* Soon after their appointment, the Commissioners set the fees to be paid to jockeys at racetracks in the Commonwealth. Subsequently, the Supreme Court of Pennsylvania held that by the terms of the Horse Racing Act the Commission was authorized to fix jockey fees and that the fee schedule was necessary in order to deter criminal influence in the horse racing industry.

Plaintiffs argue that the *Midcal* two-part test applies .and that these standards have not been satisfied by the Commonwealth. In support of this contention, they allege that (1) this Court is not bound by the Pennsylvania Supreme Court's holding in *Gilligan* that the jockey fee schedule was authorized by the Horse Racing Act or by the Court's finding that the schedule was necessary to deter criminal influence in the horse racing industry; (2) that the clear articulation prong of the *Midcal* test has not been satisfied because the Legislature did not specifically or expressly grant to the

Commission the power to set jockey fees; and (3) that the second part of the standard has not been met because the State does not actively supervise the creation or implementation of the fee schedule.

At the outset, I must state that this Court is bound by the Pennsylvania Supreme Court's interpretation of the Horse Racing Act and Rule 9.15 of the Rules of Racing, and that the question of the necessity or wisdom of the jockey fee schedule is irrelevant to the ultimate question before the Court, *i.e.*, whether such state regulation is prohibited by the Sherman Act. The Supreme Court of the United States has repeatedly held that state courts are the ultimate interpreters of state statutes and federal courts are bound by their constructions except in extreme circumstances not present here.[8] *Mullaney v. Wilbur*, 421 U.S. 684, 691, 95 S.Ct. 1881, 1885–86, 44 L.Ed.2d 508 (1975); *O'Brien v. Skinner*, 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974); *American Railway Express Co. v. Kentucky*, 273 U.S. 269, 272, 47 S.Ct. 353, 354, 71 L.Ed. 639 (1927). State decisions are also controlling with respect to the interpretation of state administrative orders. *Sutter Butte Canal Co. v. Railroad Commission*, 279 U.S. 125, 139, 49 S.Ct. 325, 328, 73 L.Ed. 637 (1929). This Court is therefore bound by the Pennsylvania Supreme Court's holding that the Horse Racing Commission was authorized by the Legislature to fix jockey fees.

Plaintiffs assert, however, that the Pennsylvania Supreme Court's holding that the jockey fee schedule is necessary to deter criminal influence in the race horse industry is not binding on this Court. I need not

---

7. But cf. *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n*, 85 N.J. 325, 336–37, 426 A.2d 1000, 1005–06 (1981) (Two-pronged test of *Midcal* satisfied so that state commission did not violate the Sherman Act when it promulgated a rule prohibiting casinos from acquiring more than 50% of their slot machines from any one manufacturer). *See also* Comment, *The State Action Exemption in Antitrust: From Parker v. Brown to Cantor v. Detroit Edison Co.*, 1977 Duke L.J. 871, 884 (If state intent to restrict competition is expressed by a state agency, the activity should be protected by

*Parker v. Brown* if action falls within the scope of the agency's authority).

8. On rare occasions, the Supreme Court has reexamined a state court interpretation of state law when it appears to be an "obvious subterfuge to evade consideration of a federal issue." *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 129, 65 S.Ct. 1475, 1480, 89 L.Ed. 2092 (1945). *Accord, Mullaney v. Wilbur*, 421 U.S. 684, 691 n.11, 95 S.Ct. 1881, 1886 n.11, 44 L.Ed.2d 508 (1975).

reach this question for it is my judgment that the question of the necessity or wisdom of the jockey fee schedule is irrelevant to the antitrust question before the Court. The Supreme Court, in rejecting challenges to state economic regulation on substantive due process grounds, has cautioned lower federal courts against the practice of inquiring into the wisdom, need or appropriateness of state regulation, *see Ferguson v. Skrupa, supra.* If the state regulation bears a rational relation to a legitimate state purpose, it should be sustained from a due process challenge. *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213–14, 57 L.Ed.2d 91 (1978). I do not believe the Supreme Court would permit "the sort of wide-ranging inquiry into the reasonableness of state regulations" that the Court had previously forsworn, merely because the challenge to the state regulation is brought under the Sherman Act rather than the due process clause. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 439, 98 S.Ct. 1123, 1150, 55 L.Ed.2d 364 (1978) (Stewart, J., dissenting); Handler, *supra* at 7. Since the jockey fee schedule bears a reasonable relation to the state's objective of keeping criminal influences from the sport of horse racing, I need not inquire further into the efficacy or need of the fee schedule.

It does not follow, however, that merely because the Commission was authorized by the Legislature to set jockey fees that the two-pronged *Midcal* standard does not apply to the instant case. The *Midcal* test must still be applied to ensure that the fee schedule is not a mere price-fixing arrangement by jockeys that are seeking to shield themselves from liability under the "gauzy cloak" of the involvement of the Horse Racing Commission. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 106, 100 S.Ct. 937, 944, 63 L.Ed.2d 233 (1980); *Serlin Wine & Spirit Merchants, Inc. v. Healy,* 512 F.Supp. 936, 941 n.15 (D.Conn.), *aff'd sub nom. Morgan v. Division of Liquor Control,* 664 F.2d 353 (2d Cir. 1981).

The first prong of the *Midcal* formulation requires that the state regulation be "clear-ly articulated and affirmatively expressed as state policy." 445 U.S. at 105, 100 S.Ct. at 943. Plaintiffs allege that because the Legislature in the Horse Racing Act did not specifically or expressly confer upon the Commission the power to fix jockey fees, then the first component of *Midcal* has not been satisfied. This application of *Midcal* is, in my view, erroneous. In light of the Pennsylvania Supreme Court's decision in *Gilligan,* the *Midcal* test should not be applied solely to the action of the Pennsylvania Legislature, but also to the Commission's action. To apply *Midcal* to only legislative action in this case would defeat the whole purpose of establishing administrative agencies. *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 438 n.26, 98 S.Ct. 1123, 1150 n.26, 55 L.Ed.2d 364 (1978) (Stewart, J., dissenting). In most instances, a legislature delegates subordinate legislative authority to administrative agencies because of the need of relieving itself from details which are inherent in regulating economic activity. W. Gellhorn & C. Byse, Administrative Law: Cases and Comments 3 (1954). Moreover, changing conditions and the complexity of industries which give rise to regulation make specific and complete treatment by legislation impossible. *Id.* at 4. The legislature, therefore, must delegate to administrative agencies the broad power to regulate, leaving the specific methods to effectuate the purpose of the legislature to the discretion of the officers of the agency. *Id.* Thus, if courts were to apply *Midcal* only to the action of the legislature, then in most cases in order to avoid antitrust liability, a state government could only regulate economic activity by specific legislation rather than by delegation to an administrative agency. Such a situation would not only create hardship upon already-burdened state legislative bodies, but would, in many instances, preclude much economic regulation because the legislature would be institutionally incapable of assuming the regulatory function. As Chief Justice Hughes recognized in *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935):

Undoubtedly legislation must often be adapted to complex conditions involving a host of details with which the national legislature cannot deal directly. The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply. *Without capacity to give authorizations of that sort we should have the anomaly of a legislative power which in many circumstances calling for its exertion would be but a futility.*

*Id.* at 421, 55 S.Ct. at 248 (emphasis added). *Accord, Bell Telephone Co. v. Driscoll,* 343 Pa. 109, 21 A.2d 912 (1941).

The Commission being authorized by the State Legislature to set jockey fees, has clearly articulated and affirmatively expressed a fee schedule. The schedule was adopted in 1968 by the Commission and remained unchallenged and unchanged for ten years until June 1978, when the Jockeys' Guild requested an increase in fees. The fee schedule is contained in Rule 9.15 of the Rules of Racing and is codified in 58 Pa.Code § 163.181. I therefore hold that the fee schedule has been clearly articulated and affirmatively expressed as state policy by the Commission, an agency of the Commonwealth, which under state law is authorized to set jockey fees. The first prong of the *Midcal* test has therefore been satisfied.

The second part of the test has also been fulfilled for there is no question that the imposition of the jockey fee schedule is actively supervised by the State. It is the State itself, acting through the Commission, which has created the jockey fee schedule. Unlike the facts in *Goldfarb, Cantor* and *Midcal,* the jockey fee schedule is ultimately determined by a state commission not by private parties. Moreover, the fee schedule is "subject to pointed re-examination" by the Commission, when it enforces the sched-

ule with penal sanctions. *Bates v. State Bar of Arizona,* 433 U.S. 350, 362, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977). See 58 Pa.Code § 165.1. Plaintiffs contend, however, that *Midcal's* second prong is not satisfied because the Commission only "passively rubber stamps" the fee schedule proposed by the Jockeys' Guild. Even if I consider this allegation as true, as I must when considering this motion to dismiss, see *supra* note 4, this fact alone does not strip the Commission of the protection of state-action immunity.

It is not unusual to have types of regulation which are heavily dependent on the active participation of the regulated parties, who typically propose various programs, tariffs, or fee schedules, which are either adopted, rejected, or modified by the administrative agency. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 627, 96 S.Ct. 3110, 3135, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting); Fischel, *Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine,* 45 U.Chi.L.Rev. 80, 118 (1977). The Horse Racing Commission, in its discretion, determined that the original jockey fee schedule adopted in 1968 needed amending in 1978 to reflect steady increases in the cost of living during the ten years. *See Gilligan v. Pennsylvania Horse Racing Commission,* 492 Pa. 92, 94, 422 A.2d 487, 488 (1980). The Commission gave the plaintiffs and other interested parties an opportunity to object to the proposed increase in jockey fees and, after consideration of these objections, voted to adopt the proposed increase submitted by the Jockeys' Guild. Sherman Act liability cannot be imposed merely because the Commission's increase mirrored the Jockeys' Guild's proposal. To impose antitrust liability here would unduly interfere with the lawful exercise of discretion by state agencies and therefore conflict with the basic tenets of federalism. *See National League of Cities v. Usery,* 426 U.S. 833, 845–46, 96 S.Ct. 2465, 2471–72, 49 L.Ed.2d 245 (1976); *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943). *Cf. Baltimore & Ohio Railroad Co. v. Baugh,* 149 U.S. 368, 401, 13 S.Ct. 914,

927, 37 L.Ed. 772 (1893) (Field, J., dissenting) (Interference with a state government, except as to matters specifically authorized or delegated to the United States, is impermissible as it is an "invasion of the authority of the State and, to that extent, a denial of its independence.").

Accordingly, for the above reasons, I am satisfied that the clear articulation and active supervision requirements of the *Midcal* case have been met in this instant case.[9] Thus, defendants' motion to dismiss will be granted.

## II. THE JOCKEYS' GUILD'S MOTION TO DISMISS

■ Plaintiffs allege that the members of the Guild have violated the Sherman Act, first, by agreeing among themselves on a proposed increase of the jockey fee schedule and later requesting the Commission to adopt this proposal; secondly, by agreeing with the members of the Commission to increase jockey fees. Complaint ¶¶ 16, 17, 22, 36, 37. For the reasons herein stated, I hold that these allegations do not establish a violation of the antitrust laws and, therefore, I will grant the Guild's motion to dismiss.

As discussed earlier, the Commission's action in setting jockey fees is not subject to antitrust scrutiny since the fee schedule is compelled by the direction of the State acting as sovereign. Merely because the Jockeys' Guild agrees with this state policy does not render the Guild liable for violating the Sherman Act. Furthermore, the agreement among the Guild members on a proposed increase of jockey fees and the Guild's subsequent importuning of the Commission are protected from antitrust scrutiny by the *Noerr-Pennington* doctrine.

The *Noerr-Pennington* doctrine holds that concerted action by trade associations for the purpose of influencing or promoting legislative, judicial or administrative action is exempt from antitrust liability because it is necessary to safeguard these groups' First Amendment rights of association and to petition the government. The doctrine applies even if the ultimate governmental action sought would limit economic competition in the industry. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In *Noerr,* the Court said that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or executive to take particular action with respect to a law that would produce a restraint or a monopoly." 365 U.S. at 136, 81 S.Ct. at 529. Similarly, in the *Pennington* case the Court stated that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act." 381 U.S. at 670, 85 S.Ct. at 1593. Finally, in *California Motor Transport, supra,* the Court held that "it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors." 404 U.S. at 510–11, 92 S.Ct. at 612.

*See Bates v. State Bar of Arizona,* 433 U.S. 350, 361, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810 (1977); *Serlin Wine & Spirit Merchants, Inc. v. Healy,* 512 F.Supp. 936, 940 n.12 (D.Conn.), *aff'd sub nom. Morgan v. Division of Liquor Control,* 664 F.2d 353 (2d Cir. 1981). Therefore, this Court's finding that the Commission is immune warrants dismissal of the claims against the individual members of the Commission.

---

**9.** While current and past individual members of the Pennsylvania Horse Racing Commission are also named as defendants, both individually and in their official capacity, see complaint ¶ 6, there is no claim being asserted that these persons engaged in any unlawful conduct. These defendants merely personify the enforcement and regulatory powers granted under the Horse Racing Act. Thus, the only real party in interest is the Commonwealth of Pennsylvania.

The *Noerr-Pennington* doctrine is applicable here. The members of the Guild, in the exercise of their First Amendment rights of association and to petition the government, may jointly submit a proposal to increase jockey fees to the Horse Racing Commission. Since the law permits them to do this, it follows that they must be permitted to confer and to agree upon the fees they wish to propose. *United States v. Southern Motor Carriers Rate Conference, Inc.*, 467 F.Supp. 471, 485 (N.D.Ga.1979). It is vital to the effective functioning of the Commission that it be informed by the jockeys and other interested parties concerning the effectiveness or inadequacy of the current jockey fee schedule. The jockey fees were set by the Commission to ensure that jockeys received sufficient compensation so that they would not compromise their performance. *Gilligan v. Pennsylvania Horse Racing Commission*, 492 Pa. 92, 98 n.9, 422 A.2d 487, 491 n.9 (1980). In order to accomplish this objective, it is clearly permissible for the Commission to consider data and suggestions submitted by the jockeys themselves who unquestionably are the most fertile source of information concerning the adequacy of their compensation.[10]

The *Noerr-Pennington* doctrine, however, does have its limitations. The Supreme Court has held that the doctrine is inapplicable when the petitioning conduct is a "sham." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc,*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961). *Accord, California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 511, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972). Petitioning activity is a "sham" when it is not genuinely designed to influence the government. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961); Fischel, *supra* at 105. In the instant case, there are no specific factual allegations of sham activity in the complaint. On the contrary, the grava-

men of the complaint is that the Guild violated the Sherman Act because it was successful in influencing the Commission to increase the fees paid to jockeys in the state. For the above reasons, therefore, the complaint against the Jockeys' Guild must be dismissed for failure to state a claim. *See Association of Data Processing Services Organizations, Inc. v. Citibank, N. A.*, 508 F.Supp. 91 (S.D.N.Y.1980); *City of Newark v. Delmarva Power & Light Co.*, 497 F.Supp. 323 (D.Del.1980); *Bethlehem Plaza v. Campbell*, 403 F.Supp. 966 (E.D.Pa.1975).

---

10. *See* Fischel, *supra* at 95 ("The advantage of immunizing attempts to influence governmental action when the state action itself is exempt is that government officials will be able to make decisions which restrain trade more effectively if they have adequate sources of information.").