UNITED STATES of America, Plaintiff,

v.

NORTH DAKOTA HOSPITAL ASSOCIATION; the Bismarck Hospital Association of Bismarck, North Dakota; Dakota Medical Foundation; Garrison Memorial Hospital; McKenzie County Memorial Hospital; Mercy Hospital of Devils Lake; the Mercy Hospital of Williston; Rolla Community Hospital; St. Alexius Medical Center; St. John's Hospital; St. Joseph's Hospital of Dickinson; St. Joseph's Hospital Corporation; St. Luke's Hospital Association; Trinity Medical Center; and United Hospital, Defendants.

Civ. No. A2–83–131.

United States District Court,
D. North Dakota,
Northeastern Division.

July 30, 1986.

Richard S. Martin, Marybeth McGee, Special Litigation Section, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

William G. Kopit, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

VAN SICKLE, District Judge.

### I. INTRODUCTION

This is a civil antitrust action brought by the United States against the North Dakota Hospital Association (NDHA) and fourteen North Dakota hospitals. The United States charges that defendants violated the antitrust laws by agreeing to deny the Indian Health Service (IHS) a contractual price discount. Defendants deny that they violated the antitrust laws. This action is presently before the court on the parties' cross-motions for summary judgment.

In support of their motion for summary judgment, the defendants argue: 1) the evidence in the record is insufficient to meet the jurisdictional requirement of interstate commerce under the Sherman Act; 2) the Government is estopped from claiming the defendants violated the Sherman Act; 3) their actions are immune from antitrust scrutiny under the *Noerr-Pennington* doctrine; and 4) their actions do not constitute a substantive violation of the Sherman Act.

In opposition to defendants' motion for summary judgment and in support of its countermotion for summary judgment the Government contends: 1) defendants' refusal to grant a discount is in and affects interstate commerce; 2) an agreement not to grant discounts is *per se* illegal under the Sherman Act; 3) the *Noerr-Pennington* doctrine is inapplicable to this case; and 4) estoppel in not an available defense.

### II. FACTS

The IHS is an agency of the United States Department of Health and Human Services. The IHS is responsible for providing medical and hospital care to eligible Native Americans.

IHS' facilities within the state of North Dakota include clinics, ambulatory care centers, and two hospitals. IHS facilities, however, have not been sufficient to meet the health care needs of Native Americans. Therefore, IHS provides hospital care to eligible Native Americans either on a contract or open market basis at private North Dakota hospitals selected by IHS. In order for the private hospitals to receive reimbursement from IHS for the cost of health care services rendered to a Native American, the Native American receiving the services must meet IHS' eligibility requirements. The service rendered must also meet certain IHS requirements; for example, IHS may refuse to pay for a service if it determines that the service could have been provided in an IHS facility.

Defendant NDHA is a nonprofit corporation with its principal place of business in Grand Forks, North Dakota. The NDHA is a trade association for hospitals and nursing homes in North Dakota. It provides its fifty-two member hospitals with various services, including education, information, and technical assistance.

Defendant hospitals are all nonprofit, charitable institutions. In general, many of these hospitals compete against other defendant hospitals for patients and revenue.

Defendant hospitals provide hospital services to IHS patients. Aberdeen IHS is an area IHS office with jurisdiction over

1031

health care services provided to eligible Native Americans in North Dakota, South Dakota, Nebraska, Iowa, Minnesota, Wisconsin, and Michigan. Aberdeen IHS pays hospitals within this seven state region through checks drawn on the United States Treasury that are mailed from outside North Dakota. Aberdeen IHS' total expenditure of funds to defendant hospitals in fiscal year 1983 was approximately 2.7 million dollars. Also, in fiscal year 1983 IHS service units outside North Dakota paid certain defendant hospitals $266,-872.00 for services provided to seventy-eight patients. Close to ten percent of defendant United Hospital's IHS patients are from reservations located in Minnesota.

The defendant hospitals purchase substantial quantities of drugs, equipment, and supplies from out-of-state suppliers. These goods are used in providing medical services to all patients, including IHS patients.

Prior to fiscal year 1983, Aberdeen IHS contracted with defendant hospitals and reimbursed them according to each hospital's published billed charges. The billed charges differ from hospital to hospital and are developed independently by the hospitals. The published billed charges consist of each hospital's estimate of its costs, revenues, and required operating margin. The average operating margin for North Dakota hospitals is two to three percent above cost.

On August 10, 1982, Aberdeen IHS sent new proposed contracts to defendant hospitals and three other hospitals in North Dakota. These proposed contracts were to replace the existing contracts, which were to expire September 30, 1982. Among other changes, the proposed contracts contained new payment provisions. A hospital could elect to be paid either on the basis of its Medicaid rate or on a flat per diem rate, in which case the hospital would have to propose a per diem rate for IHS' consideration. The defendant hospitals lacked the data to develop the comprehensive per diem rate and the Medicaid rate was the only method of payment realistically presented to North Dakota hospitals in the proposed contracts. The cover letter informed the recipients that without a signed contract the hospital would be limited to a $10,000 maximum payment for each admission.

At the time the proposed contracts were presented to defendant hospitals, the North Dakota Medicaid program provided for reimbursement of hospitals on the basis of the Medicare cost-based reimbursement principles. Under Medicare cost-based reimbursement principles each hospital was reimbursed at the lesser of its published billed charges or its "reasonable costs." Certain costs actually incurred by hospitals were excluded from "reasonable costs" for reimbursement purposes. As a result, Medicare reimbursement to a hospital was necessarily less than that hospital's actual costs. The Medicare cost-based reimbursement methodology has been replaced in the Medicare system, in part, because it was anticompetitive. The cost-based reimbursement methodology destroyed the incentive for hospitals to be efficient and keep prices low; high cost hospitals were paid more than low cost hospitals for the same services.

The NDHA was informed of the new proposed contracts by member hospitals who sought NDHA's advice concerning the reimbursement method in the contract. On September 2, 1982, the NDHA sent a memorandum to NDHA members warning the hospitals that the IHS proposed contract could have an adverse effect on the hospitals' level of reimbursement and advised the hospitals not to take any action until further advised by the NDHA.

On September 3, 1982, Mr. Harvey Hanson, President of the NDHA, telephoned Mr. Reuben Baybars, Contract Specialist of the Contract Health Service Branch of the Aberdeen Area IHS, and invited him to meet with the association to discuss the proposed contract. Mr. Baybars accepted the invitation.

On September 22, 1982, the NDHA sent another memorandum to hospital officials. The memorandum informed members of a special meeting to be held in Bismarck on

September 30, 1982, to discuss the IHS proposed contracts. The memorandum recommended that the hospitals "meet and work collectively and take a determined position" on the IHS proposed contract.

In response to an inquiry from a North Dakota hospital on September 17, 1982, Mr. Baybars indicated that most of the provisions in the contract were negotiable.

On September 29, 1982, Mr. Baybars informed Mr. Hanson that he would not be able to attend the NDHA special meeting because of a travel freeze. Mr. Baybars also reiterated the IHS position that most contract terms were negotiable and stated that the IHS would not accept a contract unless it provided a monetary benefit for the Government.

On September 28, 1982, Aberdeen Area IHS sent a memorandum to IHS headquarters in which Aberdeen Area IHS informed IHS that after the end of November it would impose Medicaid rates on all hospitals and asked IHS' help in obtaining Medicaid rates. In the memorandum, Aberdeen Area IHS also informed IHS that it had not been able to meet with the NDHA or the South Dakota Hospital Association (SDHA) but that a tentative meeting was set for mid-October with the SDHA and that it planned on arranging a meeting with the NDHA within the next month. IHS instructed Aberdeen Area IHS to "push hard" to receive contractual Medicaid rates.

All but three of the defendant hospitals sent a representative to the September 30th special meeting. Two of the non-attending hospitals, however, had previously agreed to comply with whatever the group decided. At the meeting, over which Mr. Hanson presided, the hospitals discussed the proposed IHS contracts. Three options were discussed: 1) request an extension of sixty to ninety days to have further negotiations with the IHS, similar to what had transpired between IHS and the Montana Hospital Association; 2) return the contracts unsigned and inform IHS to negotiate individually with the hospitals; and 3) sign modified contracts and return them to

IHS along with a letter expressing the hospitals' unanimity. The third option was selected.

The defendants agreed to modify the IHS proposed contract by substituting each hospital's published billed charges for the Medicaid rate as the method of reimbursement. The defendants also collectively drafted a cover letter to accompany the modified contract. The cover letter pointed out the modifications and informed IHS that all the hospitals unanimously agreed to them. The cover letter also directed the IHS to contact Mr. Hanson if it wanted further clarification of the hospital's position with respect to the contract. Shortly after the September 30th meeting, each defendant hospital sent the IHS a signed copy of the modified contract and the cover letter.

On October 4, 1982, Mr. Hanson sent a letter to Aberdeen Area IHS reiterating that the hospitals had met, agreed on modifications to the contract, and voted to have him coordinate or clarify any issues involved with future contract negotiations. On October 5th, Mr. Hanson informed the NDHA Board of Trustees of the September 30th meeting and indicated that negotiations with the IHS were continuing.

By letter dated October 6, 1982, Aberdeen Area IHS rejected each hospitals' modified contract and informed each hospital that IHS would consider another counterproposal. Additionally, the letter asked that, if the hospital had delegated its contracting authority to Mr. Hanson, it submit an affidavit to that effect. The letter also informed the hospital that the existing contracts had expired and that it would be subject to the $10,000 limitation for open market purchases.

Mr. Baybars met with Mr. Hanson in Grand Forks on October 8, 1982. There is a factual question as to Mr. Baybars' purpose in meeting with Mr. Hanson and as to whether he expressed concern to Mr. Hanson that the actions of the NDHA and the hospitals might be a "restraint of trade." At the October 8th meeting Mr. Baybars and Mr. Hanson agreed that a meeting

should be held between the hospitals that attended the September 30th meeting and Aberdeen Area IHS representatives to resolve problems concerning the IHS contracts. The meeting was tentatively scheduled for November 3rd.

On October 13, 1982, Mr. Baybars telephoned Mr. Hanson and confirmed the November 3rd date.

Between October 13th and November 3rd, Mr. Baybars received a telephone call from Dr. Herbert Wilson, who offered his assistance to the IHS in negotiating a contract with McKenzie County Hospital. Mr. Baybars declined the offer, saying that he would be meeting with the NDHA soon and that he wanted to see what would transpire at the meeting.

The purpose of the November 3, 1982, meeting was to resolve problems relating to the IHS contracts. The meeting was held in Bismarck and was attended by all but of the defendant hospitals, except St. John's Hospital, and representatives of NDHA. The meeting was also attended by four IHS officials: Mr. Baybars; Mr. Theodore Westley, Acting Chief for Area Contract Health Services; Mr. Alan Allery, the Administrative Officer of the Aberdeen Area Office; and Ron Laverdure, the IHS representative in Bismarck.

During the meeting, the hospital representatives and the IHS officials discussed their positions concerning the proposed contracts. Hospital representatives indicated that they could not give discounts and the IHS stressed that it wanted the hospitals to sign contracts granting the IHS a discount. The IHS also reiterated that the contracts were negotiable and flexible. After a lengthy discussion, the IHS officials were asked to leave the room. The hospitals then unanimously agreed to offer the following two alternatives:

1.) TO WORK COOPERATIVEALY WITH REPRESENTATIVES OF INDIAN HEALTH SERVICES TO REVIEW THE ACTUAL EXPERIENCE OF PROVIDING INDIAN HEALTH CARE SERVICES IN NORTH DAKOTA INCLUDING PAYMENT FOR A PERIOD OF FIVE (5) MONTHS (TO APPROXIMATELY APRIL 1, 1983,) AND AT THAT TIME, TO ASCERTAIN THE PROBLEMS OF REIMBURSEMENT AND DETERMINE ACTIONS NEEDED TO RESOLVE THOSE PROBLEMS, AND/OR,

2.) TO CONTINUE ON THE SAME BASIS WITHOUT A CONTRACT.

The hospitals did not discuss a future course of action if both alternatives were rejected by the IHS. The IHS officials were called back into the room and informed of the hospitals' action. The IHS representatives were asked whether they wished to respond to the hospitals' proposal at the meeting or at a later time; they stated that they wished to respond in writing at a later time.

Subsequent to the November 3rd meeting, Mr. Baybars and Mr. Stein, Area Contracting Officer for Aberdeen Area IHS, informed the IHS headquarters that Aberdeen Area IHS would not sign contracts with any North Dakota hospital unless the hospital agreed to a discount of some type. They also informed IHS headquarters that the hospitals currently were subject to the open market $10,000 limitation and that "[t]here is not pressure on the hospitals unless a patient's costs will exceed the $10,000 mark." Finally, they informed IHS that there also was resistance to granting discounts from hospitals in other states.

The Aberdeen Area IHS responded to the hospitals' proposal by letter dated November 24, 1982, which was sent to each defendant. Entitled "Response to Special Meeting, 11–2–82 [sic], Bismarck, North Dakota," Aberdeen Area IHS acknowledged receipt of the minutes of the November 3rd meeting and rejected both proposals because they provided no advantage to IHS. The letter also indicated that IHS wanted to work cooperatively with the hospital regarding negotiating payment schedules and that the $10,000 open market limitation applied in the interim. Finally, in the November 24th letter, IHS stated that it had not received an indication in writing

giving the NDHA negotiating authority and requested the hospital to indicate in writing if such was the case.

On December 14, 1982, the Board of Trustees of the NDHA (Board) met and discussed the IHS contract. After discussing the November 24th letter and its request that each hospital indicate in writing if it had given the NDHA negotiating authority, the Board discussed negotiations and antitrust concerns. The Board voted to wait sixty days before taking any action, in order to allow time for Mr. Hanson and legal counsel to research the subject.

On December 29, 1982, NDHA sent the hospitals a memorandum in which it informed the hospitals that it would study all facets of the IHS contracting problem before the hospitals took any united action and would make a recommendation in February. The NDHA recommended to the hospitals that in the meantime they continue to provide services under the open market $10,000 limitation.

Mr. Hanson never did provide the report at a Board meeting. No further action was ever taken by the Board on the IHS matter.

On August 19, 1983, NDHA sent a memorandum to defendant hospitals informing then that the Justice Department was investigating a possible antitrust violation by the NDHA and some of the member hospitals concerning their activities in response to the proposed IHS contract. The memorandum also emphasized that the NDHA would not "in any way prevent, discourage, or inhibit any member hospital from doing what it believes to be in its own best interest with regard to contract discussions or negotiations with the IHS."

The Government filed this antitrust suit against the defendants on August 25, 1983.

The IHS made no further attempts to negotiate a contract with any defendant hospital for approximately two years. On July 8, 1985, the Aberdeen Area IHS submitted proposed contracts to thirteen of the fourteen defendant hospitals. Each defendant hospital responded to the contract proposal independently, without any discus-sion, communication, or meeting with other hospitals or the NDHA. The only communication between the defendants concerning the proposed contract was a memorandum sent out by the NDHA to all member hospitals on July 26, 1985. In the memorandum Mr. Hanson pointed out and explained some of the contract provisions along with some of their benefits and disadvantages. Concerning the various reimbursement methods hospitals could select under the proposed contract, Mr. Hanson indicated that, in his view, "payment on the basis of each hospital's independently arrived at normal fee schedule is the best way to insure that all classes of patients pay their fair share of the medical cost at each of your facilities." Mr. Hanson also stressed several times in the memorandum that the decisions as to whether the hospitals would submit a contract proposal or provide services on an admission-by-admission basis and as to what reimbursement method it selected (if it submitted a contract) must be made by each hospital individually, based upon that institution's policies and the economic impact of the choice on that hospital.

## III. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment may be entered only when, "viewing the facts and inferences that may be derived therefrom in the light most favorable to the nonmoving party, the moving party establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1272 (8th Cir.1983) (citing *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir.1983)), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984). In order for a genuine issue of material fact to be present, the factual issue need not be resolved conclusively in favor of the party asserting its existence. *First National Bank v. Cities Service Co.,* 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). "[R]ather, all that is required is that sufficient evidence supporting the claimed factual dis-

pute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 288–89, 88 S.Ct. at 1592. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* — U.S. —, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *Cities Service,* 391 U.S. at 289, 88 S.Ct. at 1592).

## B. JURISDICTION

Section 1 of the Sherman Act makes illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. § 1 (1976). The requirement of interstate commerce is an element of both the jurisdictional standard and the substantive offense under the Sherman Act. *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 721 F.2d 68, 71 (3d Cir.1983).

The interstate commerce jurisdictional standard may be satisfied under either the "in commerce" or the "effect on commerce" theories. *See McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980); *Hayden v. Bracy,* 744 F.2d 1338, 1342 (8th Cir.1984); *Cardio-Medical Associates,* 721 F.2d at 71. The United States contends that the defendants' activities are both in and substantially affect interstate commerce.

To establish jurisdiction under the "in commerce" theory, the Government must demonstrate that the defendants' activities are an integral part of an interstate transaction. *See Goldfarb v. Virginia State Bar,* 421 U.S. 773, 784, 95 S.Ct. 2004, 2011, 44 L.Ed.2d 572 (1975). *See also McLain,* 444 U.S. at 244, 100 S.Ct. at 510. To establish jurisdiction under the "effect on commerce" theory, the Government must establish that defendants' activities "which allegedly have been infected by a price-fixing conspiracy be shown 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." *McLain,* 444 U.S. at 246, 100

S.Ct. at 511 (quoting *Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976)). The Government is not required, under either theory, to quantify the adverse impact of defendants' activities or to prove that they resulted in legally cognizable damages. *McLain,* 444 U.S. at 243, 100 S.Ct. at 509.

In *McLain,* sellers and buyers of real estate brought a private antitrust suit against New Orleans real estate brokers. The plaintiffs alleged that the brokers had engaged in a price fixing conspiracy by agreeing to fixed commission rates. The Supreme Court stated the following concerning the relevant activity for jurisdictional purposes:

> [i]t would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful.

*McLain,* 444 U.S. at 242–43, 100 S.Ct. at 509. The Eighth Circuit, in interpreting *McLain,* has held that the antitrust plaintiff must establish that the *challenged conduct* occurs in or affects interstate commerce. *Hayden,* 744 F.2d at 1343 n. 2. Thus, for purposes of establishing Sherman Act jurisdiction, the relevant activity is the activity of defendants that is alleged to be a restraint of trade. *Id.*

■ The alleged restraint in this case concerns the price at which defendant hospitals would provide services to IHS patients. The lines of interstate commerce that the Government identifies as relevant in this action are revenues from out-of-state third party payers, purchases from out-of-state vendors, and treatment of patients who travel across state lines. The provision of medical services to all patients, including IHS patients, is local in character but the undisputed facts in this case estab-

lish that the alleged restraint affects interstate commerce.

The undisputed facts in this case show that the IHS paid defendant hospitals approximately $2.7 million in fiscal year 1983 for services rendered to IHS patients. The undisputed facts also establish that these funds were disbursed to defendant hospitals from outside North Dakota. Defendants' alleged activity in fixing the price of services rendered to IHS patients would tend, in a practical sense, to affect the reimbursement from the out-of-state payer (IHS) in a substantial amount. The Government, therefore, has presented sufficient evidence to satisfy the jurisdictional requirements of the Sherman Act.

C. LEGALITY OF DEFENDANTS' ACTIVITY

To determine whether defendants have violated the Sherman Act, the court must address whether defendants' collective activity concerning the IHS contract constitutes an agreement or conspiracy that unreasonably restrains trade. *See* 15 U.S.C. § 1 (1976); *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 98, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984).

1. Concerted Action Requirement

Section 1 of the Sherman Act prohibits conspiracies in restraint of trade, 15 U.S.C. § 1, and thus requires proof of concerted action, *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984).

To meet the concerted action requirement, the Government must establish that the defendants entered into either an express or implied agreement, that "the defendants shared a 'unity of purpose or a common design and understanding, or a meeting of the minds' to engage in the conduct prohibited by the Sherman Act." *Id.* at 1273 (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946)).

■ The facts in the record establish that at the September 30th meeting, which was conducted by the defendant NDHA, the defendant hospitals unanimously voted to modify the IHS proposed contract by substituting each hospital's published billed charges for the Medicaid rate as the method of reimbursement. The record also undisputably establishes that the hospitals collectively drafted a cover letter to accompany the modified contract which informed Aberdeen Area IHS that all the hospitals agreed to the modifications. The evidence also establishes that at the November 3rd meeting the defendant hospitals unanimously agreed, after discussing the contract with IHS, to the following two alternatives: 1) continue for five months under the billed charges reimbursement method and then, at that time, ascertain and resolve reimbursement problems; and 2) continue without an IHS contract.

The record also contains evidence establishing that the hospitals all had previously existing, independently developed policies against providing preferential rates or discounts on the published fee schedule. The evidence also reflects that at the September 30th meeting the hospitals did not even discuss signing the contracts as written and that prior to the September 30th meeting at least ten hospitals had expressed their unwillingness to sign the contract as proposed. Defendants also stress that it was not in the economic interest of the hospitals to accept the IHS contracts as proposed.

Defendants contend that these facts indicate that they merely contemporaneously expressed their preexisting, independently developed policies and did not enter into an agreement within the meaning of the antitrust laws. Therefore, defendants contend, there exists a genuine issue of fact concerning the existence of an agreement. The Court disagrees.

The record contains direct evidence of an express agreement between defendant hospitals, a meeting of the minds, reached at the September 30th meeting and reaffirmed at the November 3rd meeting, to adhere to their existing independent policies against voluntarily giving discounts by

denying IHS' request for Medicaid reimbursement rates. The record also establishes that defendant NDHA was involved in the agreements. NDHA President Harvey Hanson advised the hospitals to work collectively and take a determined position concerning the IHS contract. The NDHA also organized and conducted the September 30th and November 3rd meetings.

The court concludes that the record taken as a whole could not lead a rational trier of fact to conclude that there was no agreement within the meaning of the antitrust laws. Therefore, there is no genuine issue for trial. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)).

### 2. Unreasonable Restraint of Trade Requirement

Section 1 of the Sherman Act literally prohibits *every* agreement in restraint of trade. *See* 15 U.S.C. § 1 (1976). "[T]he Supreme Court has long recognized, however, [that] Congress could not have intended a literal interpretation of the word 'every.'" *Lewis Service Center, Inc. v. Mack Trucks, Inc.*, 714 F.2d 842, 845 (8th Cir. 1983) (citing *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 342, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982)), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984). The Court has, therefore, interpreted the Sherman Act as prohibiting only "unreasonable" restraints of trade. *See Federal Trade Commission v. Indiana Federation of Dentists*, —— U.S. ——, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986). A restraint is "unreasonable" if it fits within a class of restraints that have been deemed to be per se illegal or violates the "rule of reason." *Id.*

Under the rule of reason analysis the challenged restraint is scrutinized in order to determine whether, under the circumstances of the case, it promotes or suppresses competition. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691–92, 98 S.Ct. 1355, 1365–

66, 55 L.Ed.2d 637 (1978). Once experience with a particular type of restraint has led courts to predict that the rule of reason will condemn it, the courts apply a conclusive presumption that the restraint is unreasonable, i.e., declare it *per se* illegal. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 334, 102 S.Ct. 2466, 2468, 73 L.Ed.2d 48 (1982). Thus, " '[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations....' " *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963)).

Agreements that interfere with the setting of price by free market forces have been deemed *per se* illegal. *National Society of Professional Engineers*, 435 U.S. at 692, 98 S.Ct. at 1365. A restraint may be classified as *per se* unlawful price fixing even though there was no direct agreement on the actual prices to be maintained. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980). A restraint is illegal *per se* if its purpose and effect is to raise, depress, fix, peg, or stabilize prices. *Id.* (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940)). The United States contends that the concerted activity in this case falls within the category of restraints which have been labeled *per se* price fixing.

The United States contends that the agreement in this case is the type of agreement that the Supreme Court held to be *per se* illegal in *Catalano*. *Catalano* involved an agreement between beer wholesalers, who had previously competed with each other with respect to trade credit, to sell to retailers only if payment was made in cash in advance or upon delivery. *See* 446 U.S. at 644, 100 S.Ct. at 1926. The Supreme Court held that this agreement was a price fixing agreement that was illegal *per se*. *See id.* at 650, 100 S.Ct. at

1929. The Government contends that the agreement between defendants was an agreement to deny a discount to IHS, similar to the agreement in *Catalano,* and falls within the *per se* category of restraints.

█ The agreement between defendants, however, cannot be classified as an agreement to refuse to grant IHS a discount. By agreeing to refuse to accept the Medicaid reimbursement methodology in the IHS contract the defendants thereby also agreed to accept the $10,000 per admission payment limitation. The $10,000 limitation has resulted in the following discounts on billed charges: St. John's Hospital, twenty-eight percent; Mercy Hospital of Devil's Lake, five percent; St. Joseph's Hospital of Minot, thirteen percent; St. Alexius Medical Center, fifty-four percent; Bismarck Hospital, eleven percent; United Hospital, twenty percent; Dakota Hospital, at least ten percent; St. Luke's Hospital, two percent; Trinity Hospital, three percent; and McKenzie County Memorial Hospital, twenty-one percent. The defendants' agreement to reject one reimbursement method in favor of another, therefore, has resulted in the hospitals granting IHS discounts. Thus, the restraint does not fall squarely within the *Catalano* price fixing mold.

The agreement in the instant case does not fit squarely with the price fixing mold for three other reasons. First, because of the uniqueness of IHS contracts, defendants lacked the ability to set the actual prices for the services they provided to IHS patients. The IHS's obligation to pay for services is limited to the availability of funds. The IHS historically has a funding shortfall every year, resulting in significant sums that IHS annually does not pay to defendant hospitals for care provided to IHS patients. Therefore, in the final analysis the prices defendants receive for the services provided to IHS patients are not determined by the hospitals.

Second, while the evidence establishes the hospitals compete on a general basis with other defendant hospitals for patients and revenues, it does not establish that they compete for IHS contracts or patients. The evidence indicates that the IHS has not treated the hospitals as competitors: the IHS did not examine or compare the charges each hospitals proposed and the IHS has not exercised its right to refer patients to whatever hospital it chooses. Furthermore, an examination of the IHS contracts indicates they are not the type of contracts for which the hospitals were likely to compete. The IHS contracts asked the hospitals to provide services to IHS patients at rates which were necessarily below the hospitals' costs. The IHS contracts offered no guarantee of increased patient volume. And, as noted previously, the IHS contracts contain a provision making IHS's obligation to pay for services contingent upon the availability of funds. In the past IHS had repeatedly run out of funds before the end of the fiscal year, resulting in large sums of money for which the hospitals were never paid for services rendered to IHS patients.

Third, the restraint in question differs from the typical price fixing restraint in its ultimate purpose. Generally, the ultimate purpose of price fixing restraints is to increase the seller's profit on the goods or services sold, which harms the consuming public. Here, however, the ultimate purpose of defendants' restraint was not to maximize their profits, but to protect other patients and payers from having to absorb the cost of granting discounts to the IHS.

Because the restraint in question does not fall squarely within the price fixing mold, the court declines to apply the *per se* analysis. *See In re Michigan State Medical Society,* [Transfer Binder 1979–83] Trade Reg.Rep. (CCH) ¶ 21,991, at 22,445, 22,460 (Feb. 17, 1983) (since the agreement on reimbursement issues does not involve direct fee setting, the Federal Trade Commission is not prepared to declare it *per se* illegal and close the door on all asserted procompetitive justifications). Also, the Supreme Court recently reconfirmed that it is reluctant to declare *per se* illegal restraints involving professional services,

*Federal Trade Commission v. Indiana Federation of Dentists*, —— U.S. ——, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986), or "restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious," *id.* The court will therefore analyze the restraint in the instant case under the rule of reason.

The restraint in the present case consists of an agreement between defendants to adhere to their independently developed, preexisting policies against granting discounts. The defendants admit that the purpose of the restraint was to prevent "cost shifting." Because defendant hospitals are nonprofit charitable entities with operating margins only a few percentage points above their costs, the Medicaid cost-based reimbursement method, which reimburses hospitals at levels below their actual costs, results in private third party payers and patients paying more to make up the difference. Hence, the cost of the discount is shifted from one payer to another. The purpose of their agreement refusing to grant IHS Medicaid rates, then, was to prevent shifting the cost of the Medicaid discount onto other patients and payers.

The effect of defendants' agreement was to foreclose any potential competition to grant IHS Medicaid reimbursement rates. Thus, the likely effect of defendants' avowed purpose would be to prevent the IHS from receiving the lower Medicaid rates and thereby increase the price IHS paid for defendant hospitals' services. Defendants' restraint, however, did not actually have this adverse effect on the price IHS paid for services. Because the hospitals continued to treat IHS patients despite the fact that they did not have a contract with IHS, the $10,000 limitation has resulted in the hospitals granting the IHS discounts ranging from two to fifty-four percent.

In analyzing the purpose and effect of the restraint in the instant case, the court notes that the evidence does not establish that defendant hospitals competed for the IHS contracts. *See supra* p. 1038. The court also notes that due to the uniqueness of the IHS program, defendants lacked the power to fix the actual price IHS paid for services. *See supra* p. 1038.

Defendants' agreement also has a procompetitive effect. The reimbursement method proposed by the IHS, the Medicaid cost-based reimbursement method, is inherently anticompetitive. The Medicaid cost-based reimbursement methodology is anticompetitive because it automatically pays high-cost hospitals more for the same service than low-cost hospitals. Hence, the Medicaid reimbursement methodology removes the financial incentive for price competition and cost containment. Defendants also assert that the restraint is procompetitive in that it proposed a single standardized reimbursement methodology, each hospital's independently developed billed charges, which makes it easier for the purchaser to make meaningful comparisons between the actual prices offered by the various hospitals.

██ After considering the purpose and effects of the agreement in question, the court concludes that it is an unreasonable restraint of trade. Although their motives in refusing to grant Medicaid rates for IHS services, namely, shifting costs to the private sector, may have been laudable, defendants nonetheless entered into an agreement which forestalled all potential competition concerning Medicaid rates for IHS contracts. The court concludes that the anticompetitive harm of this agreement outweighs the procompetitive benefits and is therefore an unreasonable restraint of trade. Defendants' agreement is an unreasonable restraint of trade because it suppresses competition. *See National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). Antitrust law does not permit this court to consider whether defendants' agreement, although anticompetitive, is in the public interest because it was intended to prevent one consumer of their services from receiving a benefit at the expense of all other consumers. *See id.* at 692, 98 S.Ct. at 1365 (a

court's antitrust analysis is directed at the competitive significance of a restraint, not whether in a particular case competition is in the public interest, because that policy decision has been made by Congress).

## D. FIRST AMENDMENT IMMUNITY

The defendants contend that their activities with respect to the IHS were legitimate exercises of their First Amendment rights to assemble and petition the government and are protected from antitrust scrutiny by the *Noerr-Pennington* doctrine.

The *Noerr* and *Pennington* cases established that the Sherman Act does not apply to joint efforts to influence public officials. *See United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 135–36, 81 S.Ct. 523, 528–29, 5 L.Ed.2d 464 (1961).

In *Noerr,* the Supreme Court held that concerted action by railroads to influence legislative and executive action that would be detrimental to the trucking industry, the railroads' competitor in the long-haul freight business, was not subject to the Sherman Act. *Noerr,* 365 U.S. at 145, 81 S.Ct. at 533. The Court stated: "the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." *Id.* at 138, 81 S.Ct. at 530.

The Court's holding in *Noerr* was based on three considerations. *See id.* at 136–38, 81 S.Ct. at 528–30. First, the Court noted:

> [such associations] bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements.

*Id.* at 136, 81 S.Ct. at 529. Second, the Court observed that to hold that the Sherman Act applied to such associations "would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade" because the government would be deprived of a valuable source of information. *See id.* at 137, 139, 81 S.Ct. at 529, 530. Third, the *Noerr* Court recognized that the right to petition the government is one of the freedoms protected by the First Amendment. *See id.* at 138, 81 S.Ct. at 530. The Court also noted that such a holding "would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act." *See id.* at 137, 81 S.Ct at 529.

In *Pennington,* the Supreme Court applied *Noerr* in holding that the Sherman Act did not apply to concerted activity by a labor union and large coal mine operators to influence the Secretary of Labor to impose a higher minimum wage for employees of contractors selling coal to the Tennessee Valley Authority (TVA), and to influence TVA officials to curtail its spot market purchases, both of which were intended to drive smaller coal mine operators out of business. *See Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593. The *Pennington* decision reiterated that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *Id.*

More recently, in *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Court discussed the *Noerr* and *Pennington* cases and emphasized the First Amendment underpinnings of the *Noerr* and *Pennington* decisions. *See California Motor Transport,* 404 U.S. at 509–10, 92 S.Ct. at 611–12. The Court held that the *Noerr-Pennington* philosophy extends to concerted approaches by carriers to administrative agencies and the courts to defeat applications by competing carri-

ers for operating rights. *See id.* at 510, 92 S.Ct at 611. The Court stated:

> We conclude that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests *vis-a-vis* their competitors.

*Id.* at 510–11, 92 S.Ct. at 612. The Court also noted that while the first amendment protects the right of individuals and groups to petition the government, whether it be the legislature, administrative agency, or court, it "does not necessarily give them immunity from the antitrust laws." *See id.* at 510, 513, 92 S.Ct. at 611, 613. The Court in *California Motor Transport* also reiterated that the *Noerr-Pennington* doctrine does not protect "sham" activities, *see* 404 U.S. at 516, 92 S.Ct. at 614, that is, activities ostensibly directed toward influencing government action but that in reality are mere shams to disguise anticompetitive activities directed against competitors, *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533.

While the Supreme Court has held that concerted activity designed to influence any branch of the government to take action that would be detrimental to petitioners' competitors is protected from antitrust scrutiny, it has not addressed the applicability of the *Noerr-Pennington* doctrine to concerted activity directed at the government as consumer or seller in the marketplace. The Federal Trade Commission (FTC) and the District Court for the Middle District of Tennessee, however, have addressed the applicability of the *Noerr-Pennington* doctrine to concerted actions of this type.

In *COMPACT v. Metropolitan Government,* the court held that the *Noerr-Pennington* doctrine did not protect from antitrust scrutiny concerted activity seeking to influence the government as a participant in the marketplace. *See COMPACT v. Metropolitan Government,* 594 F.Supp. 1567, 1573 (M.D.Tenn.1984). In *COMPACT,* minority-owned architectural firms formed a joint venture to bid on contracts and subcontracts for the construction of large government projects, which eliminated any competition between the firms as to these contracts, in order to obtain larger shares of public contracts. *Id.* at 1569–71. The firms were attempting to wield power resulting from the minority business enterprise set-aside provisions for public contracts in order to defeat racial discrimination. *See id.* 1571–73. The court held that the *Noerr-Pennington* doctrine did not protect the concerted activity of the firms. *See id.* at 1573. The *COMPACT* court stated that the basic principle underlying *Noerr* and *Pennington* is that "the Constitution protects *political* activity by citizens when addressing government in its *legislative* capacity" and that "[t]here is no such protection of *commercial* activity by businessmen when dealing with government in its *propriety* capacity." *See id.* at 1573. The court concluded that the firms' actions "were taken in the marketplace and are subject to full scrutiny under the Sherman Act." *See id.*

In *In re Michigan State Medical Society* the FTC discussed the applicability of the *Noerr-Pennington* doctrine to a case in which the Michigan State Medical Society (Medical Society) and its member physicians engaged in concerted activity directed against Blue Cross and Blue Shield and the state Medicaid program in order to effect changes in their reimbursement policies. *In re Michigan State Medical Society,* [Transfer Binder 1979–83] Trade Reg.Rep. (CCH) ¶ 21,991, at 22,445 (Feb. 17, 1983). The concerted activity consisted of attempting to negotiate agreements with the third-party payers on reimbursement methods and threatened collective departicipation in the programs. *Id.* The FTC held that the *Noerr-Pennington* doctrine did not protect the concerted activity of the defendants that was directed toward the state Medicaid agency. *Id.* at 22,465.

The FTC's decision that the *Noerr-Pennington* doctrine was inapplicable was

based on two factors. *See id.* at 22,463–465. First, the FTC found that the Medical Society's conduct involved, in addition to mere efforts to persuade legislators and Medicaid officials, actions that directly interfered with the competitive relationships between Medical Society members and the Medical Society and the Medicaid program. *See id.* The FTC noted that the conduct of the defendants went "beyond the 'mere solicitations' of governmental action and is similar in nature to the kinds of arrangements that the Court in *Noerr* viewed as being within the traditional purview of the antitrust laws." *See id.* Second, the FTC found that prohibiting the Medical Society from entering or attempting to enter agreements with governmental third-party payers on reimbursement issues would not deter it from exercising its first amendment right to provide information and express its views to government agencies on reimbursement policies and other issues. *See id.* Thus, based on these considerations, the FTC held that the *Noerr-Pennington* doctrine did not shield the Medical Society's activities from antitrust scrutiny.

The FTC also addressed the applicability of the *Noerr-Pennington* doctrine when the government is a purchaser of defendants' services in *In re Superior Court Trial Lawyers' Association*, No. 9171 (Fed. Trade Comm'n June 23, 1986). In *Superior Court Trial Lawyers' Association* the Association and its members "agreed to stop providing legal services to the District of Columbia for indigent criminal defendants, until the District increased the fees it paid for such services." Slip op. at 1. The FTC found that the *Noerr-Pennington* doctrine did not protect the Association's concerted activity from antitrust scrutiny. *Id.* at 41–42. The FTC's decision that the *Noerr-Pennington* doctrine did not apply was based upon its conclusion that the fundamental principle underlying the *Noerr-Pennington* line of authority was that the restraint resulted from government rather than private action. *See id.* at 42. The FTC concluded that, in the case before it, the Association generated the restraint and the restraint affected the government as

the customer of the Associations' services. *See id.*

In reaching this conclusion, the FTC analyzed the *Noerr-Pennington* line of authority and concluded that the doctrine only has been applied in cases in which the government has played the role of an independent decision maker not directly involved in the market in question. *See id.* at 67. The FTC also noted that this conclusion is also consistent with the "sham" exception to the *Noerr-Pennington* doctrine because the "sham" exception applies when the competitors' action, not the government's, has imposed the restraint. *Id.* at 68 (citing *California Motor Transport*, 404 U.S. at 511–16 [92 S.Ct. at 612–15]). From its analysis of the *Noerr-Pennington* cases, the FTC also concluded that "no policy reason supports an immunity from the antitrust laws simply because the government is the target." *Id.* at 69.

At oral argument and in their brief defendants contend that the decision in *Horsemen's Benevolent and Protective Association, Inc. v. Pennsylvania Horse Racing Commission*, 530 F.Supp. 1098 (E.D.Penn.), *affirmed*, 688 F.2d 821 (3d Cir. 1982), supports their position that the *Noerr-Pennington* doctrine applies in the instant case. In *Horsemen's Benevolent and Protective Association* the state Racing Commission raised the set fees that the horse owners had to pay jockeys. 530 F.Supp. at 1100. The horse owners claimed that the Sherman Act had been violated because the jockeys had agreed among themselves on a proposed schedule of fees and because the Racing Commission adopted the fee schedule proposed by the Jockey Guild. *Id.* The District Court for the Eastern District of Pennsylvania held that "the agreement among the Guild members on a proposed increase of jockey fees and the Guild's subsequent importuning of the Commission are protected from antitrust scrutiny by the *Noerr-Pennington* doctrine." *Id.* at 1109. The court's conclusion that the *Noerr-Pennington* doctrine applied was based upon the view that the first amendment rights of association and

to petition the government permitted the jockeys to jointly submit a proposal to increase jockey fees to the Racing Commission. *See id.* at 1110.

*Horsemen's Benevolent and Protective Association,* however, did not involve a restraint directed against the government as consumer and is therefore distinguishable from *COMPACT, Michigan Medical Society,* and *Superior Court Trial Lawyers' Association. See supra.*

■ The court concludes that neither the cases discussing the applicability of the doctrine nor the policies underlying the *Noerr-Pennington* doctrine support its application in the case at hand. The court concludes that the *Noerr-Pennington* doctrine does not protect from antitrust scrutiny the agreement of the defendants to refuse to accept IHS's proposal for reimbursement rates at Medicaid levels.

## E. ESTOPPEL

Defendants contend that the Government is estopped from claiming that they have violated the Sherman Act.

The application of estoppel principles to the government raises special concerns because it undermines the interests of the citizenry as a whole in obedience to the rule of law. *Heckler v. Community Health Services of Crawford,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Nevertheless, the Supreme Court has refused to establish a flat rule that estoppel may not in any circumstances be applied against the government:

> [W]e are hesitant ... to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor and reliability in their dealings with their Government.

*Id.* at 60–61, 104 S.Ct. at 2224.

A party cannot, however, prevail in asserting estopple principles against the government "without at least demonstrating that the traditional elements of an es-

toppel are present." *Id.* at 61, 104 S.Ct. at 2224.

To establish an estoppel claim defendants must prove: 1) false representation by the government with intent to induce defendants to act on that representation; 2) defendants' lack of knowledge or inability to obtain the true facts; and 3) reliance on the misrepresentation by defendants to their injury. *Story v. Marsh,* 732 F.2d 1375 (8th Cir.1984).

■ Defendants cannot establish an estoppel defense in this case. Reading the evidence in the light most favorable to defendants, it establishes that the IHS encouraged the hospitals to meet jointly. First, the IHS wanted and agreed to meet with the hospitals as a group. Second, the IHS declined to negotiate individually with one of the hospitals in late October, 1982, telling the hospital that it wanted to see what transpired at the November 3rd meeting. Third, the IHS suggested that the hospitals have Mr. Hanson negotiate with IHS on their behalf by twice asking the hospitals to submit authorization in writing if they wanted Mr. Hanson to do so. Assuming that these facts establish a false representation, the defendants cannot establish an estoppel claim because they cannot establish that they relied upon these representations. Defendants had already met on September 30, 1982 and entered into an agreement to deny IHS Medicaid reimbursement rates *before* IHS encouraged the hospitals to act jointly. The September 30th meeting was arranged solely upon the iniative of the NDHA. There is no evidence to suggest that defendants relied in any way upon the fact that an IHS representative had initially agreed to attend the meeting in agreeing to deny IHS's request for Medicaid reimbursement methodology. Therefore, defendants cannot prove that they relied to their detriment upon a representation of the IHS in reaching their agreement.

## F. INJUNCTIVE RELIEF

Having found that defendants violated the Sherman Act, the court must address

the issue whether injunctive relief is necessary.

In order for an injunction to issue, "the court must determine that a cognizable danger of future violation exists and that danger must be more than a mere possibility." *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir.1982) (citing *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931)). "The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights ..." *Id.* (quoting *Holiday Inns of America, Inc. v. B & B Corporation*, 409 F.2d 614, 618 (3d Cir. 1969)).

■ The Government has failed to prove that there is a presently existing actual threat of defendants violating the antitrust laws.

The undisputed facts in this case indicate that when the IHS submitted proposed contracts to thirteen of the fourteen defendant hospitals in July, 1985, the hospitals all responded to the proposal independently, without discussing the contract or meeting with any other hospital. Although the NDHA sent the hospitals a memorandum discussing the proposed IHS contract, it did not suggest joint action in responding to the contract; to the contrary, the NDHA stressed that each hospital was to respond to the contract individually, based upon the hospital's policies and economic concerns. The undisputed facts also indicate that in 1985 the defendant hospitals entered into contracts with Blue Cross that contained a reimbursement formula established by Blue Cross. The undisputed facts also indicate that the hospitals negotiated these contracts on an individual basis and, in signing the contracts as proposed, rejected the NDHA's recommendation that they not sign the contract because reimbursement was not based upon the hospitals' billed charges.

The record also indicates that the antitrust violation occurred in response to a unique set of circumstances that are un-

likely to recur. First, the defendants were aware that the IHS had met with the Montana Hospital Association concerning the proposed contract. Second, defendants had been informed that the IHS lacked the authority to impose Medicaid rates. Third, the IHS had not, as it was required to do, given notice of the proposed change in reimbursement methods or given hospitals the opportunity to comment on the proposed changes.

The court concludes that the record before it indicates that there is no continuing threat of antitrust violations.

## IV. CONCLUSION

The court concludes that there are no genuine issues of material fact and that plaintiff has established that it is entitled to judgment as a matter of law. The court also concludes that plaintiff has failed to establish the need for injunctive relief.

Therefore,

IT IS ORDERED:

Defendants motion for summary judgment is denied.

Plaintiff's cross-motion for summary judgment is granted, insofar as it sought a declaration that defendants had violated the Sherman Act.

Plaintiff's request for injunctive relief is denied.